(No. 76654.—

## THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DAVID PORTER, Appellant.

*Opinion filed November 22, 1995.*

HARRISON, J., took no part.

Charles M. Schiedel, Deputy Defender, of Springfield, and Steven L. Clark, Assistant Defender, of Chicago, both of the Office of the State Appellate Defender, for appellant.

James E. Ryan, Attorney General, of Springfield, and Charles R. Garnati, State's Attorney, of Marion (Barbara A. Preiner, Solicitor General, and Arleen C. Anderson and Michael M. Glick, Assistant Attorneys General, of Chicago, of counsel), for the People.

CHIEF JUSTICE BILANDIC delivered the opinion of the court:

Following a jury trial in the circuit court of Williamson County, the jury returned verdicts finding the

defendant, David Porter, guilty but mentally ill of two counts of second degree murder and guilty but mentally ill of two counts of first degree murder (Ill. Rev. Stat. 1991, ch. 38, pars. 9—1, 9—2). All four of the murder counts arose from the same act, namely the murder of the defendant's mother. The trial court entered judgment only on one count of guilty but mentally ill of first degree murder. The defendant waived a jury for sentencing. The trial court found the defendant eligible for the death penalty based on the statutory aggravating factor of murder in the course of a felony (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(6)), and further found that there were no mitigating factors sufficient to preclude the imposition of the death penalty. The defendant's sentence has been stayed pending his direct appeal to this court. (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603, 609(a).) For the reasons expressed in this opinion, we reverse the defendant's conviction, vacate the imposed sentence and remand for a new trial.

## FACTS

On May 31, 1991, the body of 65-year-old Verna Mae Porter was found on the bathroom floor of her home in Pittsburg, Illinois, by her sons James and Steven Porter. Verna shared this home with her other son, David Porter, the defendant. The defendant resided in the enclosed front porch, but he had access to the remainder of the house, including the residence's only bathroom where Verna's body was found. Prior to discovering Verna's body, James Porter was contacted by Marlene Rickey, a real estate agent, who had been trying to sell Verna's house for about six months. Marlene testified that she had been unsuccessful in contacting Verna on either May 30 or May 31, 1991. Marlene stated that she became concerned because she knew that Verna suffered from a heart condition. As a result, Marlene asked James to check on his mother.

After receiving Marlene's telephone call on May 31, 1991, James contacted his brother Steven and they went to Verna's house. Upon arriving at the house, they saw that there were no signs of forced entry, no broken windows, and that the house was locked. They used their keys to gain entrance into the house and eventually discovered their mother, Verna, lying facedown on the bathroom floor. When efforts to revive her failed, they summoned an ambulance and the county sheriff. While they were waiting for the ambulance and the sheriff to arrive, the defendant came walking toward the house.

Dane Johns, a deputy sheriff for the Williamson County sheriff's department, arrived at the scene at approximately 3 p.m. on May 31, 1991. He testified that the defendant arrived about 15 to 20 minutes later. Deputy Johns took a written statement from the defendant, wherein the defendant admitted that he had engaged in a verbal confrontation with his mother between 12 and 12:30 a.m. on May 30, 1991. After the confrontation, the defendant went for a walk. The defendant stated that he did not use the bathroom in the house on May 30, 1991, because, while out walking, he used the restroom facility at a local church.

Aside from Deputy Johns, three detectives from the Williamson County sheriff's department arrived at the scene at approximately 3:26 p.m. These detectives performed a thorough search of the victim's residence. Each testified that there were no signs of forced entry to the exterior of the residence, and that there were no signs of an interior struggle.

In addition to searching the residence, Detective William Marks also spoke with the defendant that day. In their conversation, the defendant described his whereabouts over the past two days. The defendant stated that at 12:30 a.m. on May 30, 1991, he was unable to sleep because his mother's television was too loud. He

asked her to turn it down and she became cantanker-ous. After listening to her for 20 to 30 minutes, he returned to his room and put on earphones and went to sleep. That same day he got up early, went for a walk and returned home around 10 a.m. He then left again and walked around most of the day. On May 31, 1991, he also left the residence early, walked around and returned home at about 10 a.m. On both days, he had waited for his mother to knock on his door at 10 a.m. because it was routine for him to take her to the nurs-ing home to visit his father each morning. She did not knock on his door on either morning so he went for walks on both days. According to Detective Marks, the defendant showed a lack of remorse over his mother's death.

Monte Blue, the Williamson County coroner, was also present at the scene. He observed the victim lying on the bathroom floor. She was wearing a sweatshirt, pants and underwear. Blue testified that he examined her body to determine its position at the time of death. The position of the victim's body appeared to indicate that she died on her face and stomach. However, her body's lividity, which is the staining of the body after death, showed otherwise. When a person dies, the blood settles to the lowest point in the body. If an individual were to die on her face, the blood should settle to her face and stomach. Despite the fact that Verna was found lying on her face and stomach, there was lividity on her heel and calf. In his opinion, there could not be lividity on her heel and calf if she had died facedown on the bathroom floor. He also noticed that her wrists were bruised. The unusual presence of lividity and bruising made him suspicious that the cause of death was something other than a heart attack. Therefore, Blue ordered an autopsy.

Dr. John Heidingsfelder, a forensic pathologist,

performed the autopsy on June 1, 1991. During an external examination of Verna's body, he found multiple areas of reddish discoloration of the skin, particularly on the forearms, the wrists, and on the back side of the hands. These areas, he testified, represented recent bruising of the skin. In his internal examination, Dr. Heidingsfelder observed bruising within the tissues of the head and on both sides of the chest. He also found that Verna had 18 rib fractures. Finally, Dr. Heidingsfelder conducted a sexual assault examination. He took swab samples from the vaginal and rectal areas, which were sent to the lab for tests. He also performed an external examination of the victim's genital organs. Although Dr. Heidingsfelder did not find evidence of tears in the external genitalia, he stated that there can be a sexual assault without such tears.

Based upon his examination, Dr. Heidingsfelder made the following conclusions regarding Verna's death. Dr. Heidingsfelder estimated Verna's death occurred between 6 a.m. and 2 or 3 p.m. on May 30, 1991. He testified that the bruises on the forearms were consistent with forceful squeezing of the forearms, the wrists and the hands in connection with restraining or manipulating Verna's physical position. The rib fractures suggested that her arms were held upwards, or that she was perhaps held by one or both arms while receiving a blunt trauma to both sides of the rib cage, possibly in the form of kicks. He noted that the fractures appeared to have caused a tearing of the inner lining of the chest, but only a small amount of blood was present, indicating that the rib fractures occurred minutes prior to death. In his opinion, the injuries sustained were caused by another individual since they were not the type of injuries that could be sustained in a single fall or even multiple simple falls. Dr. Heidingsfelder concluded that Verna was the victim of a physical assault. He opined

that the rib fractures and blunt force injuries that Verna received to the chest caused her to have heart failure and die.

After receiving the results of the autopsy, the defendant was interviewed by detectives at the Williamson County sheriff's department. Detective Shaunn Curry explained to the defendant that the autopsy had revealed some unusual injuries on his mother's body. After the defendant waived his *Miranda* rights, Detective Curry questioned the defendant about his whereabouts on May 30 and May 31, 1991. The defendant stated that at 12:30 a.m. on May 30, 1991, he heard the television playing so he asked his mother to turn it down. The defendant claimed that he and his mother did not get into an argument or fight. Instead, he returned to his room, put on headphones and went to sleep. At 7 a.m. he left the house and walked around until 10 a.m. when he returned home in order to take his mother to visit his father at the nursing home. His mother did not come out of the house so he walked around and used a restroom at a church. He returned home again at 6:30 p.m. He watched television until 10:30 p.m. and went to sleep. According to the defendant, he stayed in his room the whole time except when he went outside to the garage and urinated into a milk jug. On May 31, 1991, he got up at 7 a.m. and went for a walk. When he returned at 3 p.m. the police were at the house. He stated that he never went into the main part of the house on May 31, 1991.

The defendant was arrested on June 4, 1991. A search warrant authorizing the gathering of evidence from the defendant's body was obtained. Pursuant to the warrant, Detective Curry obtained hair, saliva, and blood samples, which were taken to a laboratory for tests. Some of these samples were also placed in a sexual assault evidence collection kit.

Taylor Scott III, a forensic scientist specializing in serology and employed by the Illinois State Police Crime Lab, testified on behalf of the State regarding his examination of the vaginal swabs taken from the victim. According to Scott, the swabs contained semen but no sperm cells. He testified that, because the genetic marker testing on the semen was inconclusive, he was unable to compare the defendant's blood to the semen. Scott therefore concluded that any male, including the defendant, could have left the seminal material found on the swab.

The State also presented expert testimony in the area of DNA (deoxyribonucleic acid) at the defendant's trial. Dr. Robert Allen, the scientific director for the American Red Cross, Missouri-Illinois Regional Blood Services in St. Louis, testified on behalf of the State as an expert on DNA. In Dr. Allen's opinion, it is possible to perform DNA fingerprinting on a semen sample and compare that DNA fingerprint to the DNA fingerprint derived from a sample of blood taken from a suspect. In this case, Dr. Allen performed DNA testing on the vaginal swabs taken from the victim's body and the blood samples of Verna, the defendant and his brothers, James and Steven. Dr. Allen testified that, in his professional opinion, the DNA profile of the person who deposited the seminal material in the victim matched the DNA profile derived from the blood sample of the defendant. Furthermore, his results indicated that the probability that Verna and her assailant were related was 99.99%. Dr. Allen's conclusions were based upon consistencies between the genetic fingerprint of the DNA extracted from the vaginal swab and the genetic fingerprint examined in both Verna and the defendant. An examination of three separate genetic markers present on the swab revealed consistencies in two respects with both Verna's genetic markers and with those of

the defendant. Additionally, where a third genetic marker from the swab differed from Verna's DNA, it matched the defendant's DNA profile. Dr. Allen testified that the statistical probability of such a match would be one in 330,000 among unrelated Caucasians or one in 500,000 among unrelated African-American individuals. Finally, Dr. Allen stated that he was able to exclude James and Steven as possible assailants because certain genetic markers were present in their DNA fingerprints that were not present on the vaginal swab.

The defendant's case in chief consisted of his own testimony and the testimony of a clinical psychologist.

The defendant testified about his whereabouts on May 30 and May 31, 1991. He stated that at 12:30 a.m. on May 30, 1991, his mother had both the radio and television on loud. He told her the neighbors might complain because of the loud noise and returned to his room. Twenty minutes later the defendant believed his mother was having a seizure because she was stomping her foot. When she did that they never got along well so he stayed away from her. He put on his stereo headphones and went to sleep. The defendant then woke up at 6 a.m. and went for a walk and returned to the house at 10 a.m. His mother never came out of the house to go to the nursing home. Consequently, the defendant went for another walk and returned at 6:30 or 7 p.m. He watched television until 10:30 p.m. and went to sleep. On May 31, 1991, he got up at 6 a.m. and went for a walk. He returned to the house at 10 a.m. and waited for his mother. She never came out of the house, so he went for another walk. He returned at 3:20 p.m. and saw the ambulance. The defendant denied beating his mother to death or in any way causing her death.

Clinical psychologist David Warshauer, who was employed at the Choate Mental Health and Developmental Center in Anna, Illinois, evaluated the defendant

while he was in the county jail. He testified that the defendant suffers from a mental illness termed paranoid personality disorder, which at times can become a paranoid schizophrenic disorder. Dr. Warshauer noted that the defendant had been admitted to Anna State Mental Hospital in 1987 after he alleged that his family members were committing homosexual acts on him while he was sleeping and were trying to poison him. At that time, the defendant also indicated his doubts that Verna was his mother and subsequently threatened to rape her. During the defendant's stay at the hospital in 1987, he was diagnosed as having a paranoid personality disorder. According to Dr. Warshauer, a paranoid person under stress can easily "decompensate" into a paranoid schizophrenic for a period of time. In Dr. Warshauer's opinion, Verna's loud television could have triggered the defendant's "decompensation." When "decompensation" occurred, the defendant could not control what he was doing and became hostile. Dr. Warshauer concluded that at the time of the offense the defendant was suffering from a paranoid schizophrenic reaction, could not conform his actions to the law, and was therefore insane.

In rebuttal, the State presented clinical psychologist Daniel Cuneo, an employee at the Illinois Department of Mental Health. Dr. Cuneo agreed with Dr. Warshauer's diagnosis that the defendant had a paranoid personality disorder, which is an unwarranted suspiciousness about people. However, he disagreed with Dr. Warshauer's conclusions regarding the defendant's "decompensation" into paranoid schizophrenia. According to Dr. Cuneo, a person cannot lapse into a schizophrenic reaction. In Dr. Cuneo's opinion, the defendant was legally sane at the time of the offense because he had an ability to understand the criminality of his conduct and to conform his conduct to the requirements of the law.

At the close of the evidence and arguments, the jury returned verdicts finding the defendant guilty but mentally ill of two counts of second degree murder and guilty but mentally ill of two counts of first degree murder. After considering the defendant's post-trial motion, the trial judge ruled that the guilty but mentally ill second degree murder verdicts were inconsistent with one of the guilty but mentally ill first degree murder verdicts and rejected those three verdicts. The trial judge, however, entered judgment on the guilty but mentally ill first degree murder verdict, which was based on felony murder.

Having waived a sentencing jury before trial, the defendant was sentenced by the trial judge. The trial judge found the defendant eligible for the death penalty based upon the statutory aggravating factor of murder in the course of another felony. After determining that there were no mitigating factors sufficient to preclude the imposition of the death penalty, the trial judge sentenced the defendant to death.

## ANALYSIS

The defendant's primary contention of error is that the jury verdicts, finding him guilty of both first and second degree murder for the death of his mother, were inconsistent. According to the defendant, the verdicts were inconsistent because the murder of one person could not be both first degree murder and second degree murder at the same time.

The defendant was charged by information with four counts of murder. Count I alleged first degree murder in that the defendant beat his mother, "knowing such act created a strong probability of death or great bodily harm," thereby causing her death. (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(2).) Count II alleged first degree murder in that the defendant with "intent to kill or do great bodily harm" beat his mother, causing her death. (Ill. Rev. Stat.

212

1991, ch. 38, par. 9—1(a)(1).) Count III alleged first degree murder in that the defendant beat his mother, "knowing said act would cause the death." (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(1).) Count IV alleged first degree murder in that the defendant, while committing aggravated criminal sexual assault, beat his mother, causing her death. (Ill. Rev. Stat. 1991, ch. 38, pars. 12—14(a)(5), 9—1(a)(3).) On each count, the jury was instructed that it could find the defendant guilty of second degree murder if it found that the defendant acted under a sudden and intense passion resulting from serious provocation by the victim. (Ill. Rev. Stat. 1991, ch. 38, par. 9—2(a)(1).) Following deliberations, the jury found the defendant guilty but mentally ill of second degree murder on counts I and II and guilty but mentally ill of first degree murder on counts III and IV. The trial court accepted the verdicts and excused the jury.

Defense counsel moved for the merger of all four verdicts into the verdict on the single most serious charge of intent to kill or do great bodily harm (count II). The jury had found the defendant guilty but mentally ill of second degree murder on this count. The trial court denied the defendant's motion. The trial court ruled that the first degree murder conviction in count III was inconsistent with the second degree murder convictions in counts I and II. Consequently, the trial court "rejected" the verdicts on counts I, II, and III. Nevertheless, the trial court found count IV for felony murder "viable" and acceptable. The trial court therefore entered judgment of guilty but mentally ill of first degree murder under count IV.

The issue now before this court is whether the verdicts returned by the jury were inconsistent and, if so, whether the trial court employed the proper remedy for resolving the inconsistency.

Initially, the State urges that the defendant's claim has been waived by the defendant's failure to raise it at

trial and in his post-trial motion. (*People v. Shum* (1987), 117 Ill. 2d 317, 340; *People v. Stewart* (1984), 104 Ill. 2d 463, 488.) In fact, the record reveals that the defendant did challenge the consistency of the verdicts in the trial court. In his motion following the verdicts, defense counsel argued that the verdicts had to be "reconciled" through merger of the four verdicts into count II for intentional murder. The jury had returned a guilty but mentally ill of second degree murder verdict with respect to count II. It is evident from the arguments and ruling noted above that the trial court and the parties recognized that the verdicts were inconsistent and that defense counsel was objecting to the verdicts on that basis. In view of the foregoing, we find that the issue has not been waived.

In resolving the issue before this court, we must first examine the interplay between first and second degree murder. As previously set forth, the jury was instructed on both first degree and second degree murder as to each count in the information. Second degree murder was premised upon a jury finding that the defendant's acts were the result of a sudden and intense passion resulting from serious provocation. This court has previously held that second degree murder is first degree murder plus mitigation. (See *People v. Jeffries* (1995), 164 Ill. 2d 104, 122.) In other words, all of the elements of first and second degree murder are identical. (See *Jeffries*, 164 Ill. 2d at 122-23.) Second degree murder differs from first degree murder only because of the presence of a mitigating factor, such as the serious provocation alleged in this case, or an unreasonable belief in justification. (See *Jeffries*, 164 Ill. 2d at 122-23.) Where a defendant is charged with first degree murder, and it is alleged that the mitigating factor of serious provocation was present, the jury must decide: (1) whether the State proved all of the elements of first degree murder and, if so, (2) whether the mitigating factor of

serious provocation was present at the time of the murder. If the jury finds that serious provocation was present, then the defendant is guilty of second degree murder. However, if the jury determines that serious provocation was not present, then the defendant is guilty of first degree murder. Consequently, a jury must find either "provoked" second degree murder or "unprovoked" first degree murder.

Here, the jury returned verdicts on four counts of murder. With respect to counts I and II, the jury found that there was sufficient provocation for the defendant to be guilty of second degree murder. However, the jury also found that serious provocation had not been proven with respect to counts III and IV such that the defendant was guilty of first degree murder. Consequently, the jury found that the defendant's killing of his mother was both provoked and unprovoked. A single murder cannot be both provoked and unprovoked at the same time. The jury's verdicts were therefore both legally and logically inconsistent.

Having established that the verdicts were inconsistent, we must examine the propriety of the trial court's actions with respect to those verdicts. When a jury returns inconsistent guilty verdicts, the trial judge has a duty to send the jury back for further deliberations after additional instructions to resolve the inconsistency. (*People v. Spears* (1986), 112 Ill. 2d 396, 410; *People v. Almo* (1985), 108 Ill. 2d 54, 63-64.) Under such circumstances, it is improper for a trial court to enter judgment on one or more of the verdicts and vacate the other verdicts. The rationale behind this rule is that a trial court may not usurp a jury's function to determine innocence or guilt by second-guessing which guilty verdict was intended by the jury and which was the result of some misconception. (*Almo*, 108 Ill. 2d at 63-64.) Thus, a trial court's failure to send the jury back for further

deliberations to resolve inconsistent verdicts mandates a reversal and a new trial on all counts. *Spears,* 112 Ill. 2d at 410.

Here, the trial court noted that it could or should have sent the jury back to reexamine the inconsistent verdicts. Nevertheless, the trial court did not do so but, instead, it rejected counts I, II, and III and entered judgment as to count IV. We find that the trial court erred in failing to order the jury to resume its deliberations and return consistent verdicts. By attempting to interpret the jury's verdicts, the trial court usurped the jury's function. We therefore conclude that the proper remedy in this case is to reverse the trial court's judgment and to remand for a new trial on all counts.

Because we are remanding this case for a new trial, we will consider briefly whether the evidence was sufficient to prove the defendant's guilt beyond a reasonable doubt. After thoroughly reviewing the evidence, we find it to have been sufficient to support the guilty verdicts. We therefore find that there is no impediment to a new trial. (See *People v. Hope* (1986), 116 Ill. 2d 265, 279; *Spears,* 112 Ill. 2d at 410; *People v. Taylor* (1979), 76 Ill. 2d 289, 309.) Nevertheless, we in no way imply that we have made a finding as to the defendant's guilt that would be binding on the court on retrial. *People v. McDonald* (1988), 125 Ill. 2d 182, 202.

## CONCLUSION

Because of our disposition of this case, we need not consider the defendant's remaining contentions of error in this appeal. For the reasons stated, we reverse the defendant's conviction and remand this cause to the circuit court for a new trial.

*Reversed and remanded.*

JUSTICE HARRISON took no part in the consideration or decision of this case.