FIFTH DIVISION
 Filed: 02/14/97










No. 1-95-1100

THE PEOPLE OF THE STATE OF ILLINOIS, ) APPEAL FROM THE
 ) CIRCUIT COURT OF
 Plaintiff-Appellee, ) COOK COUNTY
 )
 v. ) 
 )
MARCUS ROGERS, ) HONORABLE
 ) RICHARD NEVILLE,
 Defendant-Appellant. ) JUDGE PRESIDING.


 JUSTICE HOFFMAN delivered the opinion of the court:

 The defendant, Marcus Rogers, was charged by indictment with
two counts of first degree murder. 720 ILCS 5/9-1(a)(1), (2) (West
1994). After a bench trial, the circuit court found the defendant
guilty of second degree murder and sentenced him to nine years'
imprisonment. The defendant filed a timely appeal from his
conviction and sentence. For the following reasons, we affirm.
 The testimony at trial revealed that Lawrence O'Kray, who
owned a two-flat building at 6741 S. Wabash, allowed Peter Greene
to throw a party in the basement apartment of his building on April
16, 1993. O'Kray lived in the second-floor apartment.
 Greene testified that he arrived at O'Kray's building on the
morning of April 16 to set up stereo equipment for his party.
Greene's party began around 8 p.m. At around 11 p.m. that evening,
Andrae Carson was fatally shot near O'Kray's building. 
 Greene admitted that he belonged to a street gang but he did
not believe the defendant was a member. According to Greene,
several members of a rival street gang drove by O'Kray's building
before the party began. He said that the victim, Andrae Carson,
was a member of this rival gang. 
 Greene testified that he left the party early in the evening.
When he returned at around 11 p.m., an ambulance and several police
cars had blocked the street and a body was lying on the sidewalk. 
Greene said he went to Dennis Stigler's house for the rest of the
night and the following day. He stated that Harold Ivy also stayed
at Stigler's house that night and remained the next day. Ivy told
Greene that he had been at the party when Carson was shot. Greene
testified that Ivy was shot and wounded the day after Carson was
shot. 
 According to Greene, he remained at Stigler's house for a
couple of days until he learned that a warrant for his arrest had
been issued in connection with the shooting of Carson. Greene
turned himself in at the police station. He was questioned and
placed in four line-ups. The police told him he had been
positively identified but then later released him, saying they had
found someone else.
 O'Kray testified that, at about 10 p.m. on April 16, he heard
some voices on his back porch. He recognized one voice to be the
defendant's. O'Kray heard someone say "did you hit him" to which
the defendant responded "I think so. I don't know." O'Kray said
he did not know what the conversation was about. He did not recall
ever telling police officers that, after he heard gun shots, he
went to his back porch and saw Greene, Ivy, and someone named Tony
standing on his back porch. He also did not recall telling
officers that he heard Ivy say "did you hit him?" and Tony
responding "I don't know." O'Kray admitted he had a serious
problem with alcohol and that he had been drinking on the night of
the incident. O'Kray also testified that he sustained a head
injury about a month after the shooting and, consequently, had
suffered some memory loss. 
 William Payne testified that he arrived at the party around 8
p.m. to help Greene with the music. He said that the defendant was
sitting behind him during the party for about an hour and a half. 
Later that evening, Ivy entered the apartment and shouted
something. According to Payne, everyone at the party, including
the defendant, started running for the back door. 
 Dwayne Esper testified that he attended the party with the
defendant and Greg Washington. Esper said that Ivy entered the
apartment at around 11 p.m. and told everyone to leave. Esper
recalled that the defendant was with the "dee-jay" playing music
when this occurred. 
 Darryl Preacely testified that he lived across the street from
O'Kray's building. On the evening of April 16, 1993, he heard
gunshots and went to his window. Preacely saw a man with a shiny
object in his hand run across the street and get into a car. He
did not see the man shoot anyone. Preacely also saw a body lying
on the ground about fifteen feet from where the man was running. 
He identified Greene in a line-up as the man he saw running to the
car. 
 Gregory Washington testified that he and the defendant left
the party a few times during the evening of April 16 but returned
with another friend at around 11 p.m. Washington said he went
outside for awhile and the defendant remained inside. Suddenly, 
while sitting in a car with a friend, Washington heard gunshots. 
Washington ran into the party and then joined the defendant and
others running out the back door. On April 19, Washington and the
defendant were picked up by the police for questioning. Washington
said he was placed in two line-ups, was told that he had been
identified, but was released shortly thereafter. 
 Detective George Karl testified that his first interview with
the defendant was on April 19, 1993, at about 5:15 p.m. According
to Karl, the defendant stated that he left Greene's party for
awhile and then decided to return. He told Karl that he heard
gunshots on his way back to the party and quickly left the scene. 
After the defendant stood in a line-up, Karl had a second
conversation with him. Karl said that the defendant admitted he
had not told the truth during their first interview and that he had
actually been working "security" at the party for his street gang. 
The defendant told Karl that he had been instructed to pick up a
gun on the back porch and watch for rival gang members. After he
observed a black male walking through a gangway, the defendant
grabbed the gun and walked through the party and out across the
front yard of O'Kray's building. According to Karl, the defendant
said that the black male stood about five feet from the defendant,
removed a gun from his pocket, and shot at him. The defendant told
Karl that he shot at the man three times and then ran back into the
apartment.
 Karl conducted a third interview with the defendant at 8:35
p.m. on April 19. Assistant State's Attorney Solita Pandit was
present during this interview. According to Karl, after Pandit
informed the defendant that no gun was recovered from the victim,
the defendant substantially reiterated his story from the second
interview but omitted any reference to the victim pulling out a gun
or shooting at him. Instead, the defendant told Karl and Pandit
that he shot three times in reaction to seeing the victim quickly
remove his left hand from his sweatshirt pocket. Pandit wrote down
the defendant's account of the incident which he then read and
signed. This statement was entered into evidence. 
 Ivy gave the police a written statement on April 19, 1993, in
which he admitted that both he and the defendant were members of
the same street gang. Ivy stated that he had acted as a "dee-jay"
at Greene's party and the defendant had worked security for the
gang. Ivy said that he heard gunshots and then saw someone lying
on the ground. According to Ivy, the defendant later admitted to
shooting Carson. 
 The defendant testified that three detectives came to his home
on April 19, 1993, and he willingly accompanied them to the station
to be questioned. When he was taken to an interview room, the
officers allegedly asked "[w]hy did you shoot him?" The defendant
said he denied shooting anyone. The defendant testified that he
initially told the officers he left Greene's party for awhile and,
upon returning, he heard gunshots and decided to go home. The
defendant admitted at trial that he fabricated this story because
he was afraid of being accused of the crime. 
 According to the defendant, the police placed him in two line-
ups and informed him that he had been identified. Thereafter, an
officer told him that he would be released if he pleaded self-
defense. The defendant agreed to do so. He said he told the
officer that, after he saw a black male come from the alley and run
through the gangway, he confronted the man near the front of
O'Kray's building. When the man pointed a gun at him, the
defendant shot him. The defendant contended that he asked the
officer if these acts constituted self-defense and the officer
assured him that he would be released. 
 The defendant said that Assistant State's Attorney Pandit
later read him his Miranda rights and asked him questions. He
testified that he relayed the same self-defense story to Pandit
that he had previously told the officers. The defendant recalled
admitting to Pandit that he did not actually see Carson pull out a
gun. Pandit wrote down what the defendant told her and he signed
the statement.
 At trial, the defendant was shown his signed statement
indicating that he was a gang member working security at the party,
that he saw a black male approaching him with his hands in his
pockets, that the man quickly removed his left hand from his
pocket, and that he shot the man three times. The defendant
testified that the statement was untrue and that he had only signed
it because the officers told him he would not go to jail if he
admitted that he had shot Carson in self-defense. He further
stated that the officers had suggested facts that he should include
in his statement. 
 The defendant testified that he actually attended Greene's
party that night, left a couple of times, and returned again around
10 p.m. According to the defendant, he was assisting with the
music at the party when he heard gunshots. The defendant said he
ducked down and ran towards the back door of the apartment with the
other guests. He denied being a gang member and denied shooting
Carson. 
 The trial judge found the defendant guilty of second degree
murder and sentenced him to nine years' imprisonment.
 On appeal, the defendant first contends that the trial court
committed plain error in finding him guilty of second degree
murder. The defendant argues that, since the indictment only
charged him with first degree murder, and second degree murder is
not a lesser included offense of first degree murder (see People v.
Jeffries, 164 Ill. 2d 104, 122, 646 N.E.2d 587 (1995)), he was
improperly convicted of a crime for which he was never charged. We
disagree.
 Our supreme court has held that second degree murder is first
degree murder plus mitigation; thus, the elements of first and
second degree murder are identical. Jeffries, 164 Ill. 2d at 122. 
Second degree murder differs from first degree murder only in the
presence of a mitigating factor, such as an alleged provocation or
an unreasonable belief in justification. People v. Porter, 168
Ill. 2d 201, 213, 659 N.E.2d 915 (1995). Accordingly, second
degree murder is said to be, not a lesser included offense, but a
lesser mitigated offense of first degree murder. Jeffries, 164
Ill. 2d at 122.
 Section 9-2(c) of the Criminal Code states in pertinent part:
 "When a defendant is on trial for first degree murder and
 evidence of either of the mitigating factors defined in
 subsection (a) of this Section had been presented, the
 burden of proof is on the defendant to prove either
 mitigating factor by a preponderance of the evidence
 before the defendant can be found guilty of second degree
 murder." 720 ILCS 5/9-2(c) (West 1994).
 Thus, the clear language of section 9-2(c) of the Code
provides that "[w]hen a defendant is on trial for first degree
murder *** the defendant can be found guilty of second degree
murder," regardless of the general rule that a defendant cannot be
convicted of an uncharged offense that is not a lesser-included
offense of the crime charged in the indictment (see e.g. People v.
Harris, 146 Ill. App. 3d 632, 497 N.E.2d 177 (1986)). The trial
judge need only determine that a mitigating factor, such as
unreasonable belief in the necessity of self-defense, was proven
based on the evidence as a whole. 
 Although the defendant denied any involvement in Carson's
shooting, his signed statement indicated that he shot Carson three
times because he erroneously believed Carson was about to pull out
a gun. The trial court obviously found that the evidence supported
a conviction of second degree murder "by way of unreasonable belief
in self-defense." 
 The defendant next contends that the evidence was insufficient
to convict him beyond a reasonable doubt. He claims that the
record supports the conclusion that Greene, Ivy, and someone named
"Tony" worked together to murder Carson. The defendant notes that
Greene and Ivy were admitted members of a street gang and that
Carson was known to be a member of a rival gang. In addition, the
defendant argues that O'Kray initially said he saw Greene, Ivy, and
Tony on the back porch and that O'Kray heard Ivy ask Tony "did you
hit him?" to which Tony allegedly replied "I don't know." However,
O'Kray testified at trial that it was the defendant on the back
porch who answered "I think so. I don't know." In any case, the
trial court determined that O'Kray was not a very credible witness
because of his admitted alcohol abuse and head injury. 
 Moreover, the fact that Greene and Ivy stayed away from home
after the shooting is not determinative of their involvement since
such actions could indicate fear of retaliation from the rival gang
or of being implicated in the shooting because of their presence at
the party. While it is true that Greene was allegedly seen running
with a shiny object in his hand and Ivy was shot the day after
Carson's murder, these occurrences do not conclusively establish
their involvement in Carson's murder.
 The defendant further argues that he had an alibi since
several witnesses placed him inside the apartment when the shots
were fired. However, Ivy told police that the defendant admitted
to shooting Carson and the defendant's written statement reflects
his involvement in detail. Thus, the trial court could properly
choose to disregard the defendant's alibi.
 The defendant next contends that his confession should be
given less weight since the police promised he would be released if
he pleaded self-defense. However, the record indicates that the
defendant was not coerced into making a confession. He stated at
trial that he was never threatened or harmed. In addition, the
defendant admitted that Assistant State's Attorney Pandit read him
the Miranda warnings and that he told her he understood them. 
Detective Karl testified in rebuttal that he never told the
defendant that he could go home if he made a self-defense statement
and never suggested that the defendant include certain facts in his
statement. Karl also denied that the defendant ever said he wanted
to call his mother. It was the trial court's prerogative to
determine the credibility of witnesses and the weight to be
accorded their testimony (People v. Reid, 136 Ill. 2d 27, 61, 554
N.E.2d 174 (1990)); thus, the trial court could properly accept the
officer's version of the events.
 The defendant also asserts that his confession was
insufficiently corroborated since only O'Kray's unreliable
testimony supported the defendant's signed statement. However, the
record indicates that Ivy provided a written statement implicating
the defendant in the shooting. Moreover, Karl and Pandit testified
as to the defendant's varying accounts of the incident and his
identification in the line-ups. The defendant admitted at trial
that he initially lied to the police. Accordingly, we hold the
confession was sufficiently corroborated.
 After viewing the evidence in the record in its light most
favorable to the prosecution, we cannot say that no rational trier
of fact could have found the essential elements of the crime beyond
a reasonable doubt. People v. Collins, 106 Ill. 2d 237, 261, 478
N.E.2d 267 (1985). We conclude that sufficient evidence existed to
support the defendant's conviction for second degree murder.
 The defendant last contends that the trial court committed
plain error when, in response to his request for a sentence of
intensive probation, the trial judge responded: "Thank you, Mr.
Rogers. It isn't ordinary, nor is it something that I had
considered regarding sentencing because there's a death here."
 The State contends that this argument was waived since the
defendant failed to make a contemporaneous objection at the
sentencing hearing and failed to include this issue in his post-
trial motion. See People v. McCleary, 278 Ill. App. 3d 498, 501,
663 N.E.2d 22 (1996). We agree. 
 Section 5-8-1(c) of the Unified Code of Corrections was
amended effective August 11, 1993, to state in pertinent part:
 "A defendant's challenge to the correctness of a sentence
 or to any aspect of the sentencing hearing shall be made
 by a written motion filed within 30 days following the
 imposition of sentence." 730 ILCS 5/5-8-1(c) (West 1994).
 This court has repeatedly held that the amended statute creates a
precondition for a defendant's appeal of sentencing issues. See
People v. Reed, 282 Ill. App. 3d 278, 668 N.E.2d 51 (1996); People
v. McCleary, 278 Ill. App. 3d 498, 663 N.E.2d 22 (1996); People v.
O'Neal, 281 Ill. App. 3d 602, 667 N.E.2d 516 (1996). Since the
defendant was sentenced on February 15, 1995, the amendment is
clearly applicable. The record indicates that the defendant did
not object either at the sentencing hearing or in his post trial
motion and, therefore, has waived this challenge.
 For the foregoing reasons, we affirm the judgment of the
circuit court of Cook County. As a result, we grant the State's
request for $100 as its costs for defending this appeal (see People
v. Nicholls, 71 Ill. 2d 166, 374 N.E.2d 194 (1978)) and $50 as its
costs for oral argument (see People v. Agnew, 105 Ill. 2d 275, 473
N.E.2d 1319 (1985)).
 Affirmed.
 HARTMAN, P.J., and HOURIHANE, J., concur.