2023 IL App (2d) 220306
No. 2-22-0306
Opinion filed September 19, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-80 |
| JENNIFER B. STROUD, | ) ) | Honorable Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Birkett and Kennedy concurred in the judgment and opinion.

**OPINION**

¶ 1   Following a jury trial in the circuit court of Lake County, defendant, Jennifer B. Stroud, was found guilty of endangering the life or health of a child (child endangerment) (720 ILCS 5/12C-5(a)(1) (West 2014)) and thereby proximately causing the child's death (*id.* § 12C-5(d)). Defendant was also found guilty of involuntary manslaughter (*id.* § 9-3(f)). The trial court entered a judgment of conviction on the involuntary manslaughter verdict and sentenced defendant to an eight-year prison term. Defendant argues that the verdicts are legally inconsistent and she is therefore entitled to a new trial. We reverse and remand.

¶ 2                                     I. BACKGROUND

¶ 3      Defendant and her husband, David A. Stroud, were jointly charged with two counts of child endangerment proximately causing the child's death[1] (counts I and II), and a single count of involuntary manslaughter (count III). The charges arose from the death of the parties' minor son, J.S. (a heart transplant recipient), due to neglect of his medical needs. Count I alleged that defendant and David "knowingly caused or permitted the life or health of [J.S.], *** to be endangered in that they failed to administer to [J.S.] necessary prescribed medication to [J.S.], which was a proximate cause of the death of [J.S.]." Count II alleged that defendant and David "knowingly caused or permitted the life or health of [J.S.], *** to be endangered, in that they failed to bring [J.S.] to necessary medical appointments, which was a proximate cause of the death of [J.S.]." Count III alleged that defendant and David, "acting in a reckless manner, failed to perform acts likely to cause death or great bodily harm [*sic*] to [J.S.], a family member, in that [they] failed to administer to [J.S.], on a daily basis, necessary prescribed medication, thereby causing the death of [J.S.]."[2]

¶ 4      David pleaded guilty to involuntary manslaughter. Defendant pleaded not guilty to all three charges and was tried before a jury. The evidence presented at trial was as follows. J.S. was born in 2005 with a complex congenital heart disease. Around 2010, medical personnel determined that

_____

[1]A first offense of child endangerment is a Class A misdemeanor. 720 ILCS 5/12C-5(d) (West 2014). However, if the offense is a proximate cause of the death of the child, it is a Class 3 felony carrying a possible prison sentence of 2 to 10 years. *Id.*

[2]Ordinarily, involuntary manslaughter is a Class 3 felony. 720 ILCS 5/9-3(d)(1) (West 2014). However, when the victim is a family or household member, the offense is punished as a Class 2 felony carrying a possible prison sentence of 3 to 14 years. *Id.* § 9-3(f).

J.S. needed a heart transplant. While J.S. was awaiting the transplant, medical personnel explained to defendant that she needed to administer antirejection medication to J.S. as prescribed following the transplant and attend regular follow-up appointments. They also told her that missing even one dose of the medication could cause J.S. to become sick, suffer a rejection episode, or even die. J.S.'s transplant surgery occurred in May 2012 at Children's Wisconsin in Milwaukee. Medical personnel at Children's Wisconsin testified that J.S. missed or canceled follow-up appointments on multiple occasions.

¶ 5    Scott Waggoner, a solid organ transplant pharmacist at Children's Wisconsin hospital, testified that while J.S. was in the hospital recovering from his transplant surgery, Waggoner met with defendant and David to explain J.S.'s medication regimen. Waggoner informed defendant that missing a single dose of the antirejection medication, or even one dose per month, would not necessarily lead to a rejection episode, but missing one, two, or three doses per week would be "play[ing] with fire." After J.S. was discharged, follow-up visits were scheduled with Waggoner to monitor J.S.'s medication levels. During multiple follow-up appointments, defendant advised Waggoner that J.S. had missed doses.

¶ 6    In 2015, J.S.'s care was transferred to Lurie Children's Hospital in Chicago (Lurie). J.S.'s first appointment at Lurie was in April 2015 with pediatric cardiologist Kathryn Gambetta. At that appointment, Gambetta spoke to defendant about the importance of J.S.'s medications and his follow-up care. At that point, J.S. was overdue for his cardiac catheterization. An appointment for catheterization was scheduled for May 2015, but J.S. did not attend it. The appointment was rescheduled for June, but defendant canceled it. J.S. ultimately had the catheterization procedure on December 21, 2015. Gambetta testified that although the procedure revealed no problems, she was concerned about the delay in performing the procedure. She saw "red flags" in defendant's

lack of follow-up in the months before the procedure. Gambetta further testified that a follow-up appointment was scheduled for April 2016, but J.S. missed it. The appointment was rescheduled three times, but J.S. missed all three appointments, the last of which was scheduled for August 9, 2016. At that point, one of Lurie's social workers contacted the Department of Children and Family Services (DCFS). A DCFS investigator visited defendant on August 10, 2016, to discuss defendant's failure to bring J.S. to his appointments. Defendant finally brought J.S. to Lurie on August 23, 2016. J.S. had gained 20 pounds since his December 2015 visit and complained of fatigue. Defendant admitted to Gambetta that J.S. had been missing about two doses of his medication per week.

¶ 7    J.S. was admitted to the hospital. Testing showed that he was suffering from a rejection impacting the coronary arteries. One of J.S.'s physicians, pediatric cardiologist Phillip Thrush, attributed J.S.'s condition to his failure to receive antirejection medication. J.S.'s condition deteriorated to the point where only a second heart transplant could possibly save his life. However, he was not a viable candidate for another transplant. J.S. was initially treated with extracorporeal membrane oxygenation, but after discussions about J.S.'s prognosis, defendant and David chose to suspend life-sustaining measures. J.S. died on September 11, 2016.

¶ 8    The prescriptions for J.S.'s antirejection medication required refills every 30 days. The State presented evidence that, between December 2015 and July 2016, the prescriptions were refilled only three times.

¶ 9    Defendant testified that she was legally blind in her right eye and her vision in her left eye had slowly deteriorated over the years. Before J.S. was born, defendant worked at a Wal-Mart in Gurnee. During her pregnancy, she learned that J.S. would have medical issues. After he was born, she left her job to care for him.

¶ 10    J.S. was hospitalized for a significant part of his first year of life. After the first year, J.S. had monthly follow-up appointments. Generally, defendant's parents drove her and J.S. to the appointments. Sometimes, David would drive them when he could get time off from work. Medication was prescribed for J.S., and defendant administered it. When J.S. was about two, defendant got a job at a Wal-Mart in Waukegan as a cake decorator. She worked there for approximately 2½ years.

¶ 11    In 2011, defendant and David were told that J.S. needed a heart transplant. They decided to put him on the transplant list. Defendant was aware that J.S. would require medication and would need to attend appointments at the transplant clinic. Defendant testified that, during 2012 and part of 2013, her parents brought her and J.S. to all his appointments at the transplant clinic. However, in the spring of 2013, defendant's parents moved to Arizona. Defendant managed to take J.S. to his appointments until late 2013, when she was in an automobile accident with David and J.S. David never returned to work after the accident, claiming that a back injury disabled him. According to defendant, David just sat around the house, smoking and watching television. Because defendant and David's vehicle was totaled in the accident, she relied on friends for transportation to J.S.'s appointments.

¶ 12    Defendant and David had trouble paying rent for their apartment, and in the spring of 2014, they moved into a trailer purchased with financial assistance from defendant's father. In February 2015, defendant got a job as a cafeteria worker at Warren Township High School. She told David that he "needed to step up" and help take care of J.S. When defendant started her new job, David gave J.S. his morning dose of medication. According to defendant, at some point, David became responsible for refilling J.S.'s prescriptions. Late in 2014, defendant and David learned that J.S.'s care was being transferred to Lurie in Chicago. J.S.'s first appointment at Lurie was in April 2015.

Defendant admitted that J.S. missed subsequent appointments at Lurie. She claimed that J.S. missed some appointments in 2016 because David had agreed to take him but failed to do so.

¶ 13    In closing argument, the prosecutor argued first that defendant was guilty of involuntary manslaughter. Regarding the child endangerment charges, the prosecutor said, "*this is based upon the same conduct*. If it fits what she did here, you can find her guilty of both." (Emphasis added.) Defendant's attorney conceded that defendant was guilty of child endangerment but argued that she had not acted recklessly and, therefore, was not guilty of involuntary manslaughter.

¶ 14    The trial court instructed the jury on accountability principles. See 720 ILCS 5/5-2(c) (West 2014). The jury found defendant guilty on all three counts. Defendant filed a motion for a new trial, arguing that she was not proved guilty beyond a reasonable doubt and that the trial court committed various trial errors. She did not argue that the jury's verdicts were legally inconsistent. The trial court denied the motion. After sentencing, defendant filed this timely appeal.

¶ 15                                II. ANALYSIS

¶ 16    Defendant argues that the guilty verdicts on both involuntary manslaughter and child endangerment are legally inconsistent because those offenses require proof of inconsistent mental states.

¶ 17    Defendant acknowledges that she did not raise this argument below, but she invokes the plain-error doctrine as an exception to forfeiture. See *People v. Averett*, 237 Ill. 2d 1, 18 (2010) ("The plain-error rule bypasses normal forfeiture principles and permits reviewing courts to consider unpreserved error in specific circumstances."). "Legally inconsistent verdicts present plain error, which is an exception to the general rule that issues not raised in [a] defendant's motion for a new trial are waived." *People v. Mitchell*, 238 Ill. App. 3d 1055, 1058 (1992). Accordingly, we will review this issue for plain error.

¶ 18    Verdicts are legally inconsistent "when an essential element of each crime must, by the very nature of the verdicts, have been found to exist and to not exist even though the offenses arise out of the same set of facts." (Internal quotation marks omitted.) *People v. Davidson*, 2023 IL App (2d) 220140, ¶ 59. Furthermore, it is well established that "[w]hen a jury returns inconsistent guilty verdicts, the trial judge has a duty to send the jury back for further deliberations after additional instructions to resolve the inconsistency. [Citations.]" *People v. Porter*, 168 Ill. 2d 201, 214 (1995). Failure to do so requires reversal and remand for a new trial. *Id.* at 214-15.

¶ 19    When the mental states of the different offenses are mutually inconsistent, guilty verdicts on both offenses are legally inconsistent. See *id.* The mental state for child endangerment is knowledge; as pertinent here, a person commits child endangerment "when he or she knowingly: (1) causes or permits the life or health of a child under the age of 18 to be endangered." 720 ILCS 5/12C-5(a)(1) (West 2014). The mental state for involuntary manslaughter is recklessness; as pertinent here, "[a] person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his [or her] acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he [or she] performs them recklessly." *Id.* § 9-3(a).

¶ 20    To find defendant guilty of child endangerment, the jury was required to find that defendant acted with knowledge that her conduct endangered J.S.'s life or health. See *id.* § 12C-5(a)(1). A person acts with knowledge of "[t]he result of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that that result is practically certain to be caused by his conduct." *Id.* § 4-5(b). To find defendant guilty of involuntary manslaughter, the jury was required to find that defendant recklessly performed the acts that caused J.S.'s death. See *id.* § 9-3(a).

"A person is reckless or acts recklessly when that person consciously disregards a substantial and unjustifiable risk that \*\*\* a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." *Id.* § 4-6.

¶ 21    Recklessness and knowledge are mutually inconsistent mental states. *Davidson*, 2023 IL App (2d) 220140, ¶ 59. In *Davidson*, a jury found the defendant guilty of the same offenses at issue here—child endangerment proximately causing the death of a child and involuntary manslaughter—in connection with the death of a child from an overdose of olanzapine, a drug prescribed to the child's mother that acted as a central nervous system depressant. *Id.* ¶¶ 3, 49, 53, 64. The indictment alleged that the defendant committed involuntary manslaughter in that " '[he] and one for whose conduct he [was] legally responsible gave [the victim] several prescription Olanzapine pills in an amount that cause [*sic*] [her] death.' " *Id.* ¶ 63. The child endangerment charge was based on the allegation that the defendant " 'knowingly caused the life of [the victim], \*\*\* to be endangered, in that [he] gave [the victim] several pills of prescription Olanzapine.' " *Id.* We reversed the convictions, reasoning that the jury's findings that the defendant acted both knowingly and recklessly in giving olanzapine to the victim were legally inconsistent. *Id.* ¶¶ 74-75.

¶ 22    The State argues that "[u]nder the unique facts of this case, \*\*\* where the evidence established that defendant's mental state changed over time," the verdicts of guilty of child endangerment and involuntary manslaughter were consistent. The State points out that the acts forming the basis for the charges were ongoing over nine months and that the jury could have concluded that defendant acted both knowingly and recklessly during this time. However, the State does not suggest that, in any given instance when defendant failed to give J.S. his medication, she

could have simultaneously acted knowingly and recklessly. Rather, the State's argument appears to be that the verdicts can be sustained because they are based on different acts (or series of acts). According to the State, the evidence showed that defendant "knew of the risk to J.S.'s health and life if he was not given his required daily [antirejection medication]." The State adds that "*[a]s more time passed*, defendant's ongoing failure to ensure J.S. received the necessary medications became reckless." (Emphasis added.) This argument is unpersuasive, as we will show.

¶ 23   In *Davidson*, 2023 IL App (2d) 220140, ¶ 62, we cited *People v. Spears*, 112 Ill. 2d 396, 405 (1986), for the proposition that "[t]he manner in which a defendant is charged, and the jury is instructed, provides the essential framework for analyzing the consistency of jury verdicts." The *Spears* court reasoned that "[i]t would be manifestly unfair to allow the State, with the benefit of hindsight, to be able to create separable acts on appeal, neither alleged nor proved at trial." *Id.* The court added:

> "[T]he substance of the allegations charging the defendant, as an unequivocal expression of prosecutorial intent [citation], and what the evidence showed in relation to those charges, are of particular importance in determining whether guilty verdicts could rationally and consistently be based upon separable acts accompanied by the requisite mental states." *Id.* at 405-06.

¶ 24   Furthermore, *Spears* teaches that the State's theory of the case at trial is germane to whether verdicts challenged as legally inconsistent can be sustained based on separable acts. In *Spears*, the defendant was found guilty of both attempted murder and reckless conduct in connection with the shooting of his estranged wife. *Id.* at 399. The defendant fired three shots, two of which struck or grazed the victim. *Id.* at 401. Citing, *inter alia*, *People v. Gross*, 52 Ill. App. 3d 765 (1977), the State argued that the three shots were separable acts accompanied by different mental states.

*Spears*, 112 Ill. 2d at 405. However, the *Spears* court found that *Gross* and the other the cases cited by the State were inapposite because "[i]n each of those cases the State was not, as it is here, attempting to justify guilty verdicts in direct conflict with both its theory of the case at trial and the evidence it presented in support of that theory." *Id.*

¶ 25     With these principles in mind, we conclude that the verdicts of guilty of both child endangerment and involuntary manslaughter—offenses with mutually inconsistent mental states— cannot be sustained based on the existence of separable acts. Count I of the indictment, which charged defendant with child endangerment, alleged that "on or between December 1, 2015, and September 11, 2016, [defendant and David] *** failed to administer to [J.S.] necessary prescribed medication to [J.S.], which was a proximate cause of the death of [J.S.]." Count III, which charged involuntary manslaughter, alleged that, during that same period, defendant and David "failed to administer to [J.S.], on a daily basis, necessary prescribed medication, thereby causing the death of [J.S.]." The charges alleged essentially identical acts and yielded no indication of a prosecutorial intent to distinguish between acts performed knowingly and those performed recklessly. Nor did anything in the jury instructions distinguish among the various instances when defendant did not give J.S. his medication. Furthermore, we find no meaningful support in the evidence for the State's present theory that during the time frame specified in the indictment—December 1, 2015, to September 11, 2016—defendant's mental state changed. By December 1, 2015, defendant had ample warning that administering J.S.'s medication daily, as prescribed, was necessary to prevent J.S.'s heart from failing. The State identifies no evidence that, during the relevant time frame, defendant acquired any information that could have affected her mental state. Furthermore, the State's argument that defendant's mental state changed from knowing to reckless is untenable because knowledge is not inherent in recklessness (see *id.* at 408 ("it does not follow *** that one

who acts recklessly also acts knowingly")) and because knowledge is the more culpable mental state of the two (*People v. Lattimore*, 2011 IL App (1st) 093238, ¶ 43). Thus, the State's argument curiously implies that defendant's mental state became less culpable as time passed. Moreover, the State's argument contradicts its theory at trial where, during closing argument, the prosecutor specifically stated that the charges of child endangerment and involuntary manslaughter were based on the same conduct.

¶ 26    The State argues that the jury could have made the following consistent findings: (1) defendant's failure to give J.S. his medication was a knowing act that constituted child endangerment and (2) defendant's entrusting David with the responsibility to give J.S. his morning dose was a reckless act that constituted involuntary manslaughter. This argument is apparently based on defendant's testimony that, in February 2015, she and David agreed that David would administer J.S.'s morning dose. However, the indictment's allegations do not support the theory that defendant acted knowingly with respect to *some* failures to give J.S. his medicine and acted recklessly with respect to *other* failures to give him his medicine. See *Davidson*, 2023 IL App (2d) 220140, ¶¶ 61-63 (where the charge of involuntary manslaughter alleged that the defendant recklessly performed acts likely to cause the victim's death " 'in that the defendant and one for whose conduct he [was] legally responsible gave [the victim] several prescription Olanzapine pills in an amount that cause [*sic*] the death of [the victim],' " otherwise inconsistent verdicts of guilty of both child endangerment and involuntary manslaughter could not be reconciled based on the uncharged theory that the defendant recklessly allowed the victim to fall asleep and failed to check on her, after learning that the victim's mother had already given her olanzapine).

¶ 27    Additionally, the State argues that the jury could have found defendant guilty of involuntary manslaughter based on the accountability instruction the jury received and the

evidence of David's acts and omissions regarding J.S.'s care. This argument is meritless. As pertinent here, a person is accountable for the conduct of another when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2014). The involuntary manslaughter charge was based on the reckless failure to administer medication to J.S. The State points to no evidence that defendant ever solicited, aided, abetted, agreed, or attempted to aid David's failure to give J.S. his medication.

¶ 28    The State further argues that "[t]he charging instrument allows for consistent verdicts by including a knowing offense regarding medical appointments, and a reckless offense regarding medications." However, as defendant notes, because the jury returned a general verdict of guilty of child endangerment, defendant is deemed to have been found guilty of both counts of that offense. See *Davidson*, 2023 IL App (2d) 220140, ¶ 66. Count I charged child endangerment based on the failure to administer medication. The guilty verdict on that charge is inconsistent with the guilty verdict on the involuntary manslaughter charge, which likewise charged defendant with the failure to administer medication. It is true that count II—which charged child endangerment based on the failure to attend medical appointments—is not necessarily inconsistent with the involuntary manslaughter verdict. However, "where a defendant is convicted of two or more counts that are legally inconsistent and others that are not legally inconsistent, reversal and a new trial are required as to the legally inconsistent counts and the 'counts related thereto.' " *Id.* ¶ 75 (quoting *Mitchell*, 238 Ill. App. 3d at 1060). That principle applies here.

¶ 29    The State also relies on *People v. Bustamante*, 334 Ill. App. 3d 515, 516 (2002), in which this court upheld convictions of two offenses involving inconsistent mental states, based on a

single act. *Bustamante* is readily distinguishable. In that case, the defendant threw a bottle at a parked police car, shattering the rear window. *Id.* A piece of glass struck a police officer inside the car. *Id.* The defendant was found guilty of both criminal damage to government-supported property and reckless conduct. *Id.* at 515-16. Although criminal damage to government-supported property required proof that the defendant acted knowingly, we concluded that the guilty verdict on that charge was consistent with the guilty verdict on reckless conduct. *Id.* at 521. We reasoned that case law "concerned with mutually incompatible mental states regarding a defendant's act or course of conduct toward one victim" did not govern the determination of "whether two seemingly incompatible mental states can exist contemporaneously or nearly contemporaneously with respect to two victims or harms even though there was but one act." *Id.* We observed:

> "[T]he jury rationally could have concluded that [the] defendant acted knowingly in damaging the government-supported property but acted recklessly in causing the consequential endangerment to the safety of the officer as evidenced by the shattered glass spraying the officer. The victims and the harms are clearly separable, and the State intended to charge and prove two separate crimes." *Id.* at 522.

Here, unlike in *Bustamante*, there was a single victim and a single harm.

¶ 30    The State alternatively argues that, even if the verdicts were inconsistent, defendant invited the error by conceding, during closing argument, that she was guilty of child endangerment and asking the jury to deliberate only on the involuntary manslaughter charge. The argument is unpersuasive. Defendant's attorney vigorously argued that defendant was *not* guilty of involuntary manslaughter; he did not invite the jury to return inconsistent verdicts.

¶ 31    Having concluded that the legally inconsistent verdicts on involuntary manslaughter and child endangerment require reversal and remand for a new trial, we briefly consider the separate

question of whether the evidence presented at trial was sufficient to sustain guilty verdicts on the charged offenses. Failing to do so would risk subjecting defendant to double jeopardy. *Davidson*, 2023 IL App (2d) 220140, ¶ 76. Upon careful consideration, we conclude that the evidence was sufficient to establish beyond a reasonable doubt that either or both defendant's failure to administer antirejection medication as prescribed and her failure to take J.S. to necessary medical appointments were a cause-in-fact and proximate cause of J.S.'s death. Concerning counts I and III, the evidence supports a finding that, in failing to provide J.S. his medication, defendant acted either knowingly (count I) or recklessly (count III)—but, of course, not both. As for count II, the evidence supports a finding that, in failing to take J.S. to necessary medical appointments, defendant knowingly caused or permitted J.S.'s life or health to be endangered. Thus, the evidence was sufficient to sustain convictions on either count I or III (but not both) and on count II. Retrying defendant on all three counts will not subject her to double jeopardy. We stress that we "have made no finding as to defendant's guilt that would be binding on the court on retrial." *Id.*

¶ 32                                      III. CONCLUSION

¶ 33    For the reasons stated, we reverse the judgment of the circuit court of Lake County and remand for a new trial.

¶ 34    Reversed and remanded.

***People v. Stroud*, 2023 IL App (2d) 220306**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 17-CF-80; the Hon. Daniel B. Shanes, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Jaime L. Montgomery, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Eric F. Rinehart, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and Max C. Boose, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |