THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AARON O'NEAL et al., Defendants-Appellants.

First District (2nd Division)   Nos. 1—94—0393, 1—94—0518, 1—94—0563 cons.

Opinion filed May 14, 1996.—Rehearing denied July 11, 1996.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Joan F. Frazier, Assistant State's Attorneys, of counsel), for the People.

Rita A. Fry, Public Defender, of Chicago (James H. Reddy and Robert Guch, Assistant Public Defenders, of counsel), for appellant Aaron O'Neal.

Michael J. Pelletier, Kenneth L. Jones, and Barbara C. Kamm, all of State Appellate Defender's Office, of Chicago, for appellants Roger Wallace and Victor Garcia.

JUSTICE DiVITO delivered the opinion of the court:

Defendants Aaron O'Neal, Roger Wallace, and Victor Garcia were found guilty of numerous offenses in connection with the gang rape of S.B. on June 2-3, 1992. Each defendant received multiple consecutive and concurrent prison sentences. On appeal, they allege errors involving the admission of a prior consistent statement, the preclusion of alibi testimony, the admission of gang evidence, improper closing argument, and the propriety of their convictions and sentences. For the following reasons, we affirm the judgments of the circuit court in part, reverse in part, vacate all the sentences, and remand for resentencing.

Garcia, Wallace, and O'Neal were tried simultaneously in severed trials: Garcia and O'Neal before separate juries, and Wallace before the court.

At the time of the offenses, Garcia was 16 years of age; Wallace was 22 years old; O'Neal was 27 years old; a fourth co-indictee, Richard Walters, was 15 years old; and the complaining witness, S.B., was 18 years old.

THE TESTIMONY OF S.B.

S.B. testified that on June 2, 1992, she had been dating Garcia for about a week, during which they had sexual intercourse once. Garcia, O'Neal, Wallace, and Walters were members of the Insane Deuces gang. On June 2, S.B. went to Hamlin Park with her friend Jessica and met up with Garcia, O'Neal, Wallace, and Walters. Garcia suggested that the group go to Wallace's apartment to drink. S.B. agreed.

At the apartment, the group played a drinking game called "Quarters." O'Neal repeatedly won and selected S.B. to drink shots of Cisco, a wine cooler. After several shots in the period of a few minutes, S.B. was more intoxicated than she had ever been in her life.

Garcia led S.B., who had difficulty walking, into the bedroom and told her that he wanted to have sex. She refused, but Garcia removed her clothes and put his penis into her vagina. She screamed. After Garcia left the bedroom, O'Neal and Wallace entered. S.B. screamed, and O'Neal yelled back, "Shut up, bitch." She did not remember anything that occurred in the bedroom after that.

The next thing S.B. recalled was being led naked to a mattress in the living room. Wallace put on a condom and placed his penis into her vagina. Simultaneously, Garcia held a gun to her head and said, "Shut up, bitch, or I'll kill you." She asked Garcia why he was letting them do this to her. Garcia did not answer. Wallace then forced her to take his penis into her mouth.

Afterwards, Garcia led S.B. back to the bedroom, where he tied her hands and legs together and covered her with a blanket. Later, she heard a knock at the door and began screaming for help. Garcia returned to the bedroom and said, "Shut up, bitch, or I'll kill you." Garcia told her to get dressed. As she was incapable of doing so herself, Garcia dressed her. S.B. had entered the apartment wearing a plastic black belt, but when Garcia dressed her he did not put it back on.

Garcia then led S.B. to a couch in the living room. From behind, someone began strangling her with a towel or a belt. She could not see who it was, but she heard Wallace say that they could not kill her because Jessica knew that she was with them. She said that she would not tell and begged them not to kill her. She then urinated and fell unconscious.

S.B. awoke several times throughout the night and vomited. In the morning, she saw that her eyes were blackened, her face was bruised, and her neck was marked. She tried to leave the apartment, but O'Neal blocked the door and told her to ask Garcia if she could go. After conversing with O'Neal and Wallace, Garcia ordered her to take a shower. She tried to lock the bathroom door, but Garcia entered, undressed, got into the shower with her, and washed her body, including her vagina. Garcia told her to lie down in the bathtub, and he attempted, without success, to insert his penis into her vagina. She asked Garcia to help her out of the tub, but he ignored her and walked out of the bathroom.

S.B. dressed, returned to the living room, and found that Stacy Wilkins had come into the apartment. Wilkins left, and Garcia, O'Neal, and Wallace told her that they wanted her to tell her family that while she was riding home on the bus, three men dragged her into their car, raped and beat her, and left her unconscious. She agreed to go along with the story because they told her that they would kill her if she did not. At Garcia's command, she took a nap.

Later, Garcia woke her up and told her that she could leave. When she walked into the living room, she found a tall man dressed in a suit and tie. The man said that he was a police officer, but he did not show her a badge. With Garcia, O'Neal, and Wallace present, he asked her what had happened. She was aware that she was being tricked, so she told the man that she had gotten into a fight. The man warned her that if "she did not say something within 24 hours that the crime would no longer be anything."

When the man left, Garcia and Wallace walked S.B. to the bus stop. Wallace begged her not to tell, said that he was sorry for what he had done, and told her that he would kill her and her family if

she told. Garcia gave her a kiss and told her that he would call later to find out what she had told her parents.

After arriving home, S.B. told Jessica and her mother what had happened. Later, at the police station, she identified a photograph of O'Neal.

When Garcia was in jail awaiting trial, he and S.B. maintained contact. She mailed more than 20 letters expressing her wish to marry Garcia and get an apartment together. She falsely told Garcia that she was pregnant with his child out of fear that he would leave her for another woman. Through his letters, Garcia expressed his love for her and asked her to testify that she did not remember what had happened. She visited him in jail on four to six occasions and sent him money. For a time, she did not wish to testify against Garcia, but a few months before trial she began dating a new boyfriend and she told Garcia to get on with his life.

## THE STATEMENT OF VICTOR GARCIA

In proceedings before the Garcia jury, Assistant State's Attorney Maria McCarthy testified concerning Garcia's July 23, 1992, statement to the police. After receiving his *Miranda* warnings, Garcia said that he was the only person to have sex with S.B. McCarthy departed the interview room and returned about 15 to 20 minutes later. She could not recall if she or the police told Garcia that his first statement did not match those of his co-arrestees. In a second interview, Garcia offered and signed a more detailed account of the incident. The statement was published to the jury.

In his statement, Garcia said that on June 2, 1992, in Hamlin Park, he and O'Neal discussed initiating S.B. into the Deucettes, a female branch of the Insane Deuces. Initiation would require S.B. to have sex with Garcia, O'Neal, Wallace, and Walters. Garcia and O'Neal told Wallace and Walters about the plan, and they agreed to participate. S.B. was not aware of the plan.

At Wallace's apartment, the group played Quarters and Garcia took S.B. into the bedroom to have sex. S.B. objected, but Garcia removed her clothes and forced his penis inside of her vagina. When she screamed for Garcia to stop, he hit her several times and told her to shut up. After Garcia left the bedroom, O'Neal and Walters entered and shut the door behind them. The two were in the bedroom for approximately 45 minutes. Garcia could hear S.B. screaming and crying and telling them to stop. When O'Neal and Walters emerged from the bedroom, Walters was carrying a handgun. Wallace then proceeded into the bedroom and closed the door. Garcia could hear S.B. crying and screaming. Walters left the apartment.

Wallace came out of the bedroom and suggested that they should bring the mattress into the living room and have sex with S.B. there. Garcia and Wallace carried the mattress out, and Wallace laid S.B. on top of it. Wallace had intercourse with her while she was crying and struggling. Garcia pointed a gun at her head and told her to shut up or he would kill her. While Garcia held the gun, O'Neal tried to put his penis in her mouth, but she refused. After the sexual contact ceased, Garcia, O'Neal, and Wallace hit S.B. on her face and body. Next, Garcia took S.B. into the bathroom and had intercourse with her in the bathtub. She was then placed in the bedroom, and a couch was pushed against the front door to prevent her from escaping while the others were sleeping.

The following morning, the three discussed shooting S.B., putting her body in a bag, and throwing her into the lake. After dismissing the idea, Garcia and Wallace went into the bedroom and attempted to strangle S.B. with her black plastic belt. Garcia and Wallace pulled on opposite ends of the belt. S.B. passed out and urinated, but the belt strap broke while she was still alive. Garcia carried her out to the living room couch and laid her down. A few hours later, Garcia and Wallace walked her to the bus stop and warned her not to tell anyone what had happened.

THE TESTIMONY OF RICHARD WALTERS

Co-indictee Richard Walters turned State's witness in exchange for a 10-year prison sentence. He corroborated S.B.'s testimony about the initial meeting in Hamlin Park on June 2 and also testified that, outside of her presence, he, O'Neal, Wallace, and Garcia discussed making her a member of the gang by getting her drunk and having sexual intercourse with her.

At the apartment, Walters observed Garcia force S.B. to have intercourse in Wallace's bedroom with the bedroom door open. Walters heard S.B. screaming and Garcia slapping her. After Garcia exited the bedroom, Walters and O'Neal entered. O'Neal had intercourse with S.B. and hit her when she told him to stop. O'Neal told Walters to "get his dick out." Walters pulled down his pants and stuck his penis in S.B.'s mouth. O'Neal then told Walters to "get his money" (*i.e.,* to have intercourse). Walters lay on top of S.B. and moved up and down while she told him to stop. After Walters and O'Neal left the bedroom, Wallace entered, closed the door, and had sex with S.B. while she screamed for him to stop. When Wallace emerged from the bedroom, he told Walters to take her into the washroom and clean her up. Walters put a cold wash cloth over her face and helped her get dressed. Walters then heard Garcia, Wallace, and O'Neal discuss

killing S.B. to prevent her from reporting them to the police. Walters attempted to leave, but O'Neal told him that he had to stay. When Walters said that he had to see his probation officer, he was permitted to leave.

## THE TESTIMONY OF STACY WILKINS

Stacy Wilkins testified that he went to Wallace's apartment at approximately 7 p.m. on June 2 and encountered Walters, Wallace, Garcia, O'Neal, and S.B. O'Neal told Wilkins to "go get his money," but Wilkins declined and left. At 9:30 the next morning, Wilkins returned to the apartment and noticed that S.B. had a black eye and a bruised neck. She told Wilkins that she had been fighting with Garcia.

Later that morning, Kenny, a neighbor of Wallace's, came into the apartment dressed in a suit and tie. Kenny told Wilkins that he was impersonating a police officer. Kenny asked S.B. what had happened, and she replied that she had fought with Garcia. Kenny asked if she wanted him to lock Garcia up, but she said no.

Wilkins received a letter from the jailed Garcia instructing him on what to say in court. In the letter, Garcia wrote that S.B. had wanted to become a Lady Deuce by having sex with Garcia and O'Neal. S.B. got drunk and said she was ready to become initiated. Garcia and O'Neal had sex with her and then left. S.B. stayed overnight at Wallace's apartment due to her intoxicated condition. The next morning S.B. told Garcia that she was going to claim that she was raped. In response, Garcia whipped her and attempted to strangle her with a string from the door. S.B. went home crying. In closing, Garcia thanked Wilkins for his help.

Wilkins sent a letter to the trial judge stating that O'Neal was the only person he saw in the apartment who was not doing anything. Wilkins testified that his mother wrote the letter after Wallace's mother said that Wilkins should write a letter telling the truth about what occurred. Wilkins signed the letter.

## OTHER WITNESSES FOR THE STATE

Officer Therese Lykins testified that she responded to a call from S.B.'s mother on June 3. Lykins found S.B. in a traumatized state with a black and blue eye, bruising to the underside of her chin, and redness on her neck. S.B. told Lykins that she had been raped in Wallace's apartment by Garcia, Wallace, O'Neal, and Walters.

Patrick Walsh, a gang crimes specialist formerly with the Chicago Police Gang Crimes Unit, testified to the geographical boundaries and organization of the Insane Deuces. He stated that O'Neal was

the leader of the gang at the time of the rape, and his older brother, Derrick O'Neal, was the leader before him. Walsh identified Derrick O'Neal as a spectator in the courtroom. Walsh also testified that Wallace was only a foot soldier.

## THE TESTIMONY OF VICTOR GARCIA

Garcia's defense at his trial was that S.B. consented to have sex with him and that, although he slapped her, he did not threaten or attempt to kill her.

Garcia testified that on the afternoon of June 2, he saw S.B. holding hands with Wallace. Garcia confronted S.B., and she replied that she was simply being friendly. Soon thereafter, a group of people went to Wallace's apartment to play Quarters. During the game, Rio, a former Deuce, arrived and left with O'Neal. After S.B. became drunk, she and Garcia had sex in the bedroom. S.B. did not object. Later, Garcia took a shower and when he emerged from the bathroom he found S.B., naked, sitting on Wallace's lap. In a fury, Garcia picked her up by the neck, slapped her on the face several times, and told her that he was leaving her for his former girlfriend in Minnesota. S.B. began to cry and threatened to claim rape if Garcia broke up with her. Garcia left the apartment and did not know what else occurred in Wallace's apartment that night.

As to his inculpatory statement, Garcia testified that in his first statement to the police he said that he was the only person to have sex with S.B. Later, either McCarthy or another officer told him that if his statement matched Walters' statement, he would go home on a juvenile case. He signed his second statement because he was frightened and wanted to go home.

Garcia also testified that Detective Spencer and an assistant State's Attorney read Walter's statement to him and told him to include matching details about choking S.B. Confronted with Walters' statement on cross-examination, Garcia conceded that it did not include mention of the choking. Garcia explained the inconsistency by stating that the police read to him from both Walters' and Wallace's statements.

Garcia wrote Wilkins instructing him to lie at trial because Wallace commanded him to do so. Wallace was a lieutenant in the Insane Deuces, so Garcia was obligated to follow his orders.

## THE TESTIMONY OF ROGER WALLACE

At his trial, Wallace presented a defense of compulsion. He contended that O'Neal forced him to have sex with S.B.

Wallace testified that he was a regular member of the Deuces,

O'Neal was the chief, and Garcia was a lieutenant. On June 2, Wallace held hands with S.B., and she told him that she was pregnant but she was afraid that Garcia wanted to leave her. Garcia became angry when he saw Wallace and S.B. holding hands. When told of the plan to introduce S.B. into the Deucettes, Wallace said that he did not think that she was the kind of girl for the "mob." He did not want to participate, but he gave the others the keys to his apartment. In the end, Wallace accompanied them because he felt uncomfortable with the idea of them being at his apartment without him.

After the Quarters game, Garcia and S.B. went into the bedroom. About 10 minutes later, O'Neal went into the bedroom, came out, and reported that Garcia and S.B. were having sex. When Garcia emerged, O'Neal reentered the bedroom and closed the door. There was loud music playing in the bedroom, over which Wallace could hear S.B.'s screams. Walters soon joined O'Neal. When the two returned, Stacy Wilkins arrived at the apartment. Garcia told him to "go get his money," but, after looking in the bedroom, Wilkins declined. O'Neal then told Wallace to go "get his money." Wallace entered the bedroom and found S.B. crying; she asked why they were doing this to her. Wallace went back to the living room and said he was not interested. Wallace tried to leave the apartment, but O'Neal flashed a gun at him and said, "You're fucking her." O'Neal explained that if Wallace did not have sex with S.B. then he would turn State's evidence on O'Neal, just as Wallace's mother had once sent O'Neal to prison.

O'Neal pushed Wallace into the bedroom. Wallace put on a condom and lay on top of S.B. She screamed. He hit her and explained that he was not going to do anything. He said that he was on top of her in case O'Neal opened the door. His penis did not enter S.B.'s vagina.

Wallace left the bedroom and told Garcia to clean S.B. up and take her home. Garcia refused, and Walters took S.B. into the bathroom. Later, O'Neal said that he wasn't convinced that Wallace had had sex with S.B., so he told Wallace to bring the mattress into the living room. At O'Neal's command, Wallace got on top of S.B. However, she was squirming too much for him to have vaginal sex. O'Neal said, "Hell with it. [Garcia], just make her suck [Wallace's] dick." As Garcia held a gun on Wallace and S.B., she performed oral sex on him.

When the others started to talk about killing S.B., Wallace said that it was unnecessary and that they should wait to see what she said in the morning. He reminded Garcia and O'Neal that Jessica

knew that S.B. was with them, and he said that he would rather go to jail for rape than for murder. Nonetheless, Garcia grabbed a belt and began choking S.B. She fell unconscious and the belt broke. Garcia retrieved a curling iron, cut the cord, and wrapped it around S.B.'s neck. Wallace briefly participated in the cord strangling because Garcia had a gun.

During the night, S.B. awoke several times and vomited. In the morning, Wilkins returned to the apartment with Kenny, who pretended to be a police officer. Later, Wallace and Garcia walked S.B. to the bus stop. As directed, Wallace told her that if she told the police, "the guys were going to kill her and her family."

## THE TESTIMONY AND DEFENSE OF AARON O'NEAL

O'Neal's defense at his trial was that he left Wallace's apartment before the assault occurred and he did not participate in the crime.

O'Neal acknowledged his membership in the Insane Deuces, but denied his status as chief. He testified that he had been a gang leader only when he was a "peewee."

On June 2, 1992, O'Neal was in the park with Wallace, Garcia, Walters, S.B., and Jessica. The group went to Wallace's apartment to play Quarters. At about 8:30 p.m., a man came looking for O'Neal, and they left the apartment together. O'Neal went to his girlfriend Ivette Cosme's house, to a shopping mall, and on to Romeoville, where he remained for two days.

O'Neal testified that nothing was done to S.B. while he was present in Wallace's apartment. Days later, he and Cosme travelled to Minnesota, where he was eventually apprehended.

Cosme testified that O'Neal came to her house with some other people at approximately 9 p.m. on June 2, 1992. He left and did not return that night.

## FINDINGS, VERDICTS, AND SENTENCING

Garcia's jury found him guilty of aggravated criminal sexual assault (Garcia's penis in S.B.'s vagina), aggravated criminal sexual assault (Wallace's penis in S.B.'s vagina), criminal sexual assault, conspiracy to commit aggravated criminal sexual assault, and aggravated unlawful restraint.

The court sentenced Garcia to concurrent terms of 30 years in prison on counts I, II, IX, and XI (aggravated criminal sexual assault), a consecutive sentence of 20 years on count XVII (aggravated criminal sexual assault), a concurrent sentence of 30 years on count XXI (aggravated criminal sexual assault), and a concurrent sentence of 15 years on conspiracy. The court merged the criminal sexual as-

sault and aggravated unlawful restraint convictions into the other counts.

Wallace was found guilty by the court of 40 counts of aggravated criminal sexual assault, eight counts of criminal sexual assault, two counts of aggravated battery, one count of armed violence, one count of conspiracy to commit aggravated criminal sexual assault, and one count of aggravated unlawful restraint. Wallace was found not guilty of attempted first degree murder, armed robbery, and compelling organization membership.

Wallace was sentenced to a total of 40 years in prison. He received 30 years for aggravated criminal sexual assault (counts I through XXXIV), a consecutive 10 years for aggravated criminal sexual assault (counts XXXV through XL), and concurrent sentences of 15 years for conspiracy, 30 years for armed violence, and 5 years for aggravated battery. The criminal sexual assault and unlawful restraint counts were merged into the other counts.

O'Neal's jury found him guilty of five counts of aggravated criminal sexual assault, four counts of criminal sexual assault, one count of aggravated unlawful restraint, and one count of conspiracy. The court sentenced O'Neal to concurrent 30-year sentences for aggravated criminal sexual assault on counts III, IX, X, XI, XIV, XVII, and XXI; a consecutive 30-year sentence for aggravated criminal sexual assault on count XII; and a concurrent 15-year sentence for conspiracy. The convictions for criminal sexual assault and aggravated unlawful restraint were merged into the convictions for aggravated criminal sexual assault.[1]

ISSUES RELATING TO CONVICTIONS AND SENTENCES

Garcia, Wallace, and O'Neal were each convicted and sentenced, on multiple counts, to consecutive and concurrent terms in prison. All three contend that the circuit court committed numerous errors. We note that each defendant has waived the sentencing issues on appeal as a result of his failure to file a written motion challenging the correctness of his sentence within 30 days of its imposition as mandated by the Unified Code of Corrections (730 ILCS 5/5—8—1 (West Supp. 1993)). Section 5—8—1(c) was amended effective August 11, 1993, to require the filing of a written motion to preserve sentencing issues for appeal. *People v. McCleary*, 278 Ill. App. 3d 498, 501 (1996); *People v. Moncrief*, 276 Ill. App. 3d 533 (1995). Our interpreta-

---

[1]Pursuant to the requirements of Supreme Court Rule 23 (134 Ill. 2d R. 23), we address all of the issues raised by defendants, except those related to the propriety of their convictions and sentences, in nonpublishable form.

tion of the mandatory requirements of the statute conforms to the holdings in *McCleary* and *Moncrief.* We nonetheless consider those issues because they are so closely related to the issues concerning the propriety of each defendant's convictions and because of the supreme court's holding in *People v. Arna,* 168 Ill. 2d 107, 658 N.E.2d 445 (1995), discussed below.

Before addressing each defendant's convictions and sentences, we address the legal principles common to all three.

■ The circuit court entered a conviction and a sentence on each defendant for both aggravated criminal sexual assault and the inchoate offense of conspiracy to commit aggravated criminal sexual assault. Under the Criminal Code of 1961, no person may be convicted of both an inchoate and a principal offense. 720 ILCS 5/8—5 (West 1992). Accordingly, we vacate the convictions and sentences for conspiracy to commit aggravated criminal sexual assault.

■ Each defendant was also convicted and sentenced on multiple counts arising out of a single act of aggravated criminal sexual assault. Because only one conviction for aggravated criminal sexual assault may result from each act of sexual penetration (*People v. Riley,* 219 Ill. App. 3d 482, 493, 579 N.E.2d 1008 (1991)), we vacate the duplicate convictions and sentences.

■ ■ Also, each defendant's sentence is void, in part, for failure to conform to section 5—8—4 of the Unified Code of Corrections (730 ILCS 5/5—8—4 (West 1992)). *People v. Arna,* 168 Ill. 2d at 113. Section 5—8—4, which provides the statutory authority for the imposition of consecutive and concurrent sentences, as of the dates of the offenses and trials, mandates consecutive terms if the offenses are part of a single course of conduct and (1) one of the convictions is a Class X or a Class 1 felony and the defendant inflicted severe bodily injury or (2) one of the convictions is for aggravated criminal sexual assault or criminal sexual assault. 730 ILCS 5/5—8—4(a) (West 1992). In violation of section 5—8—4, each defendant received at least one concurrent sentence for an aggravated criminal sexual assault conviction. As the Illinois Supreme Court held in *Arna,* the imposition of a concurrent sentence in violation of section 5—8—4 is void. *Arna,* 168 Ill. 2d at 112-13. We therefore remand the causes to the circuit court for resentencing.

■ As we discuss below, on remand, we require that the circuit court impose consecutive sentences for some convictions upon which it had previously imposed concurrent sentences. Although it is possible that defendants may receive a total sentence that is greater than their current total sentence, such a result will not be in conflict with the supreme court's holdings in *People v. Kilpatrick,* 167 Ill. 2d

439, 657 N.E.2d 1005 (1995), and *People v. Jones,* 168 Ill. 2d 367 (1995). In both cases, the court found that the circuit court had violated section 5—8—1(c) of the Unified Code of Corrections (730 ILCS 5/5—8—1(c) (West 1992)) by increasing a sentence after its original imposition. In *Kilpatrick,* the circuit court vacated consecutive sentences of six years for home invasion and nine years for attempted murder and imposed a "single sentence" of 15 years for both counts. *Kilpatrick,* 167 Ill. 2d at 440. In *Jones,* the circuit court replaced consecutive sentences of 25 years' imprisonment for attempted murder and armed robbery with a single term of 30 years for attempted murder. *Jones,* 168 Ill. 2d at 370.

In the instant case, new sentences must be imposed in place of the concurrent sentences which are void under *Arna.* A void sentence is treated as a complete nullity, without legal effect, since inception. *In re Application of Cook County Collector for Judgment & Sale Against Lands & Lots Returned Delinquent for Nonpayment of General Taxes for the Year 1985 & Petition for Tax Deed of Leslie C. Barnard,* 228 Ill. App. 3d 719, 731, 593 N.E.2d 538 (1991), *appeal denied sub nom. Standard Bank & Trust v. Barnard,* 146 Ill. 2d 652, 602 N.E.2d 477 (1992); *People v. Wade,* 116 Ill. 2d 1, 5, 506 N.E.2d 954 (1987). If the original sentences were never valid, then they do not run the risk of being impermissibly increased. As such, new sentences that replace void sentences are not subject to the section 5—8—1(c) restrictions on increased sentences discussed in *Kilpatrick* and *Jones.*

■ Similarly, section 5—5—4 of the Unified Code of Corrections does not apply to the instant situation. Section 5—5—4 provides:

> "Where a conviction or sentence has been set aside on direct review or on collateral attack, the court shall not impose a new sentence for the same offense or for a different offense based on the same conduct which is more severe than the prior sentence *** unless the more severe sentence is based upon conduct *** occurring after the original sentencing." 730 ILCS 5/5—5—4 (West 1992).

Essentially, section 5—5—4 prohibits the increase of a sentence after it has been set aside on direct review. However, section 5—5—4 does not apply when the imposition of the original sentence is void. Rather, the original sentence is considered to have never been imposed. *People v. Gardner,* 52 Ill. App. 3d 386, 389, 367 N.E.2d 437 (1977). Here, some of the imposed sentences were in violation of section 5—8—4(a) and beyond the authority of the circuit court. As such, section 5—5—4 is inapplicable.

Defendants also contend that increased sentences would violate

due process principles by penalizing them for seeking review of their convictions and sentences. *Kilpatrick*, 167 Ill. 2d at 447. However, a void sentencing order can be raised by the State or corrected by an appellate court at any time. *Arna*, 168 Ill. 2d at 113. In the instant case, defendants' sentences would be subject to amendment even if they had not exercised their right of appeal.

■ Finally, we have opted to vacate *all* the sentences imposed, even those that are valid. We have done so specifically to allow the circuit court, in its discretion, either to increase the total sentence or to impose a total sentence equal to the total of the vacated sentences. The circuit court may achieve the latter result by reducing a valid previously imposed sentence so that it and any required consecutive sentence equal the total of the vacated sentences. We emphasize that section 5—5—4 of the Unified Code of Corrections, discussed above, prohibits increasing a valid previously imposed sentence, but does not prohibit decreasing such a sentence.

On remand, we instruct the circuit court to impose consecutive sentences where required in compliance with section 5—8—4(a).

A

Wallace was sentenced to 30 years for aggravated criminal sexual assault (counts I through XXXIV), a consecutive 10 years for aggravated criminal sexual assault (counts XXXV through XL), and concurrent sentences of 15 years for conspiracy, 30 years for armed violence, and 5 years for aggravated battery.

Several convictions for aggravated criminal sexual assault predicated upon oral penetration by Garcia and O'Neal must be vacated because no evidence was offered to support the charges (counts V, VIII, XIII, XVI, XXV, XXVI, XXXI, XXXII, XXXVII, XL). Wallace's conviction and sentence for armed violence must be vacated because the State entered a *nolle prosequi* on the charge prior to trial (count XLIV). On the charge of armed robbery, the State entered a *nolle prosequi* and the court entered a finding of not guilty. As a result, the eight convictions for aggravated criminal sexual assault committed during an armed robbery must be vacated (counts XXXIII through XL) along with the corresponding 10-year consecutive sentence. Additionally, Wallace's conviction and sentence for the inchoate offense of conspiracy to commit aggravated criminal sexual assault must be vacated.

Of the remaining first 40 counts for aggravated criminal sexual assault, many implicate the one-act-one-crime doctrine. For example, counts I, IX, XVII, and XVIII each address the single act of Garcia's penis penetrating S.B.'s vagina. In total, the evidence against Wal-

lace established six acts of aggravated criminal sexual assault: vaginal penetrations by Garcia, O'Neal, Wallace, and Walters, and oral penetrations by Wallace and Walters. Wallace and the State concur that convictions for counts I, II, III, IV, VI, and VII should remain while the others are to be vacated.

The circuit court sentenced Wallace to 30 years in prison for counts I through XXXIV. The sentence is void for failure to impose consecutive sentences for each of the six aggravated criminal sexual assault convictions. *Arna*, 168 Ill. 2d at 113. Accordingly, we vacate all the sentences and remand Wallace's case to the circuit court for resentencing.

### B

O'Neal was sentenced to 30 years for aggravated criminal sexual assault on count III; concurrent 30-year terms for aggravated criminal sexual assault on counts IX, X, XI, XIV, XVII, and XXI; a consecutive 30-year sentence for aggravated criminal sexual assault on count XII; and a concurrent 15-year sentence for conspiracy.

Because counts III, XI, and XXI all concern the single act of Wallace's penis penetrating S.B.'s vagina, the convictions and sentences on counts XI and XXI must be vacated. Similarly, count XVII is duplicative of count IX, and the corresponding conviction and sentence must be vacated. The jury convicted O'Neal of committing five separate criminal acts (counts III, IX, X, XII, and XIV). The sentences for counts III and XII are appropriate; however, the sentences for counts IX, X, and XIV are not consecutive and are void under *Arna*. Additionally, the conviction and sentence for conspiracy must be vacated. We vacate all the sentences and remand the cause for resentencing.

### C

Garcia received a 30-year sentence for aggravated criminal sexual assault on count I; concurrent 30-year sentences for aggravated criminal sexual assault on counts II, IX, and XI; a consecutive 20-year sentence for aggravated criminal sexual assault on count XVII; a concurrent 30-year sentence for aggravated criminal sexual assault on count XXI; and a concurrent 15-year sentence for conspiracy. The jury found Garcia guilty of committing two separate acts of aggravated criminal sexual assault (counts I and XI). Counts I, IX, and XVII concern the single act of Garcia's penis penetrating S.B.'s vagina, and counts XI and XXI concern the single act of Wallace's penis penetrating S.B.'s vagina. Accordingly, the convictions and sentences for counts IX, XVII, and XXI are vacated. The sentence based on count II must be vacated because the jury did not return a verdict of guilty on count II.

The sentence for count I is valid, and a new consecutive sentence must be imposed for count XI. Although the court originally imposed two consecutive sentences (for counts I and XVII), new sentencing is required because the conviction and sentence for count XVII have been vacated and a new sentence for count XI must be imposed. Also, the conviction and sentence for conspiracy must be vacated. We vacate the sentences and remand the cause for resentencing.

For the foregoing reasons, the judgments of the circuit court are affirmed in part and reversed in part; all sentences are vacated; and the cases are remanded to the circuit court for resentencing.

Affirmed in part; reversed in part; sentences vacated and caused remanded for resentencing.

HARTMAN, P.J., and SCARIANO, J., concur.