THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VICTOR SALGADO, Defendant-Appellant.

First District (4th Division)   No. 1—95—0306

Opinion filed March 20, 1997.—Rehearing denied April 23, 1997.

Geary W. Kull, Daniel T. Coyne, and Mark B. Wisniewski, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Joan F. Frazier, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE WOLFSON delivered the opinion of the court:

Young men do things with their hands that signify membership in a gang. Or that show their contempt for a rival gang. Sometimes, as in this case, the signals result in violence and death on the public way.

Defendant Victor Salgado (Salgado) was indicted on charges of first degree murder, attempted first degree murder, and aggravated discharge of a firearm, in relation to a shooting incident that occurred on September 24, 1993. In a jury trial, held simultaneously with the severed bench trial of Victor Rodriguez, Salgado was found guilty of murder and attempted murder and sentenced to consecutive terms of 50 years and 20 years, respectively.

He now appeals his convictions and sentence, raising as issues: (1) whether the trial court erred by refusing to suppress his post-arrest, court-reported statement; (2) whether the trial court should have banned the prosecution from referring to defendant by his nickname, "Bam Bam"; (3) whether the trial court should have instructed the jury on second degree murder; (4) whether the first degree murder instruction given was erroneous; (5) whether it was error for the judge to have given the jury, at its request, a transcript of a witness's testimony to review during deliberations; and (6) whether the sentence imposed was excessive. We affirm.

FACTS

At 1:55 p.m. on September 24, 1993, in broad daylight, two young men were sitting in a car at a stoplight at the intersection of Belmont and Cicero when they were savagely attacked by four members of the Mighty Latin Pachukos. Before the incident was over, two shots were fired and 17-year-old James Manzella was dead. The events leading up to the shooting are not in serious dispute.

On that afternoon in September, Salgado (known as Bam Bam) and some friends left Schurz High School to get something to eat. The group, which included Victor Rodriguez (known as Sapito), Omar Chaidez (known as Monkey), Sylvia Arroyo, and sisters Sandy and Vianey Olea, rode together in Rodriguez's red Chevrolet. Their first stop was at Foreman High School to pick up another friend, Francisco Muniz (known as Flocko).

After Muniz got in the car, Rodriguez drove south on Leclair Street. As he proceeded down the street, the occupants of his car

noticed a beige Chevette traveling behind them. Seventeen-year-old James Manzella was driving this Chevette, and 18-year-old Jason Balthazar was his passenger. Though Salgado and his friends did not know Manzella or Balthazar, they decided that these two persons were "Folks," that is, members of a rival gang. They arrived at this conclusion based on certain hand signals that some of them testified they saw the passenger of the beige car (Balthazar) make. Salgado, Rodriguez, Chaidez, and Muniz were members of the Mighty Latin Pachukos, a gang that is affiliated with the group of gangs known as "the People."

Balthazar denied that he "threw gang signs" at the red car. He testified, instead, that persons in the red car were "throwing up" gang signs and "throwing down" other gang signs. Balthazar said that one of the passengers in the back of the red car was throwing down "the fork" and the "C" signs, which told him that they were rivals of the Disciples and the Cobras (gangs affiliated with the Folks).

Balthazar suggested that Manzella avoid a confrontation with the people in the red car. For this reason, when the red car drove through the intersection of Leclair and Barry Streets, Manzella turned left and traveled east on Barry. Balthazar noticed, however, that the red car backed up and began following them.

Manzella drove two blocks, then turned left again onto Lamont. He continued on Lamont to Belmont and then turned right on Belmont. Near the intersection of Belmont and Cicero, Manzella was forced to stop because a fire engine was attempting to pass by. While Manzella and Balthazar sat in the stopped traffic, the red car pulled up behind them, stopped, and four young men emerged.

One of the men, later identified as Victor Rodriguez, came to the driver's side of the beige car and began beating on the side window. Two men came to the passenger side and shouted "Disciple Killer" and "Cobra Killer" at Balthazar and began kicking and hitting the windows of the car. The man on the driver's side (Rodriguez) succeeded in breaking the side window, then he jumped on the hood and started kicking in the windshield. When this happened, Balthazar and Manzella both crouched down in the front seat. It was at this time that Balthazar heard two gunshots.

The shouts of "Disciple Killer" and "Cobra Killer" continued, Balthazar said, until he heard the screech of tires. Though he did not see it, the red car drove away.

When Balthazar next looked up, he realized that the car he was in was moving. Manzella's eyes were closed and he was "in a stiff position." Balthazar thought Manzella had fainted. The car traveled about a block before Balthazar was able to steer into a parked car to

stop. Balthazar checked his friend and found that he wasn't breathing. He jumped out of the car and yelled for someone to call the police. The police and an ambulance arrived soon after. Manzella was taken to the hospital, where he was pronounced dead.

Assistant medical examiner Dr. Tae An testified that he performed a post-mortem on Manzella, which revealed that Manzella had two bullet entry wounds and one exit wound. One bullet entered Manzella's body just below the left shoulder blade. The bullet travelled through the chest cavity, lacerated the lung and the heart, and then lodged in the right chest area. The other bullet entered Manzella's mid-back, on the right side. It passed through and exited the right chest area. In the doctor's opinion, Manzella died from multiple gunshots lacerating multiple internal organs.

Sandy Olea, Vianey Olea, and Sylvia Arroyo each testified at trial. All of them had been riding in Rodriguez's red car and witnessed the encounter with the beige Chevette on September 24, 1993. They all testified similarly and their testimony was consistent with Balthazar's testimony. The only exception was that they claimed that Balthazar initially flashed gang signs at them, which is what caused Rodriguez to pursue the beige car.

Sandy Olea testified that she was riding in the front seat of Rodriguez's red car, between Rodriguez, who was driving, and Salgado. As they drove down Leclair Street, they all took notice of a beige car traveling behind them because they saw the passenger in that car throw out gang signs. The boys in Rodriguez's car became angry and upset. They said, "They're Folks." Bam Bam (Salgado) and Flocko (Muniz) flashed gang signs back at the beige car.

At an intersection, the beige car turned left. The boys in Rodriguez's car wanted to go after the beige car. They shouted, "Let's go fuck them up." Rodriguez backed up his car and began to follow the beige car. Sandy said that she tried to stop the car by reaching over and moving the stick shift on Rodriguez's car to neutral. She told Rodriguez, "Forget about it." But Rodriguez did not listen.

When Rodriguez caught up to the beige car, which was stopped near the intersection of Belmont and Cicero, Rodriguez, Salgado, Chaidez, and Muniz got out. Muniz was carrying a baseball bat. When Muniz got to the beige car, he began hitting the rear window with the bat. Chaidez started kicking the rear side window on the passenger side; Salgado hit the passenger inside the beige car through the window. Rodriguez got on the hood of the car and started kicking in the windshield. As the four boys were attacking the beige car, Sandy, Vianey, and Sylvia all "ducked down" in the red car. At this point, they each testified, two gunshots were fired. Immediately after,

three of the boys ran back to the red car and got in. Chaidez (Monkey) ran off.

Sandy noticed that when Salgado returned to the red car he was carrying a gun. She said that Salgado removed "the grill" and hid the gun in the "ventilation area" of the car. As the car drove away, Rodriguez asked Salgado, "Why did you shoot?" Sandy said that Salgado responded, "Because he was Folks."

After the shooting, they drove around the block. They found Monkey, who got back in the car. Then they all went to lunch at a Mexican restaurant.

Vianey recalled the same sequence of events except that she did not see a gun in Bam Bam's (Salgado's) hand when he returned to Rodriguez's car. She testified, however, that as they drove away from the beige car the boys were yelling at Bam Bam (Salgado), "Why did you do that?" and "You didn't have to do that." Bam Bam replied, "He was getting crazy. He was going to get out of the car."

Sylvia's testimony matched the testimony of the Olea sisters except that she recalled that when Sapito (Rodriguez) asked Bam Bam (Salgado) "Why did you shoot?" Bam Bam replied, "I think I shot him in the back or the shoulder."

Another witness to the shooting was Clarabel Navas. She testified that on September 24, 1993, at about 2 p.m. she was leaving Community Savings Bank, which is located at the corner of Belmont and Cicero. She noticed a red car pull up behind a brown car that was stopped in traffic near the intersection. Four young men got out of the red car and began breaking windows on the brown car.

Navas said that the driver of the brown car did not move. He looked straight ahead, with his hands on the steering wheel, as if he were frozen. Then one of the four young men who had been attacking the car walked to the back of the brown vehicle, aimed at the head of the driver and fired two shots.

After the shooting the young men got back into the red car and drove off. The beige car started to move through the intersection with the driver slumped over the wheel. The police came to the scene shortly thereafter, and Navas reported what she saw to one of the police officers.

Anthony Welninski, a Chicago police officer who was working as a security guard at the Community Savings Bank on September 24, 1993, testified that, at about 2 p.m., he heard a fire truck's siren making a commotion outside and then heard one gunshot. He went to the window and looked outside, but saw nothing. Then two women came running into the bank and reported that there had been a shooting. One of the women gave Welninski the license plate number of the red car in which the shooter drove off.

Welninski went outside and saw a tall, slender Hispanic youth running from the scene. As the boy ran, he pulled his hood over his head. Welninski saw broken glass on the street and a group of people gathered around a brown car about one block away. Police cars had begun to arrive on the scene. Welninski turned over the license plate number to one of the detectives.

Detective Hugh Conwell testified that he was assigned to investigate a shooting on September 24, 1993. He and his partner drove to the intersection of Belmont and Keating, where they saw a copper-colored Chevy Chevette with its windows broken and smashed.

Detective Conwell walked down to the next intersection and met with Officer Welninski, who gave him the license plate number of the car driven by the offenders. The license number was immediately traced to Victor Rodriguez. Detective Conwell and his partner drove to the home address listed for Rodriguez. Rodriguez was not home, but Detective Conwell left his card and pager number. He asked that Rodriguez call.

Rodriguez paged Detective Conwell later that day. Detective Conwell met with Rodriguez at Rodriguez's uncle's home, then took him to Area 5 police headquarters.

Salgado was arrested later that same day. Also, Sylvia Arroyo, Sandy Olea, and Vianey Olea were brought in to headquarters to give statements.

Assistant State's Attorney (ASA) Kevin Hughes testified that he arrived at Area 5 police headquarters at about 9 p.m. on September 24, 1993. He took written statements from Arroyo and the Olea sisters, spoke with Balthazar, and then interviewed Rodriguez and Salgado.

After ASA Hughes introduced himself to Salgado, he advised him of his *Miranda* rights. Salgado indicated that he understood. Salgado then agreed to speak to Hughes, admitted his involvement in the shooting, and agreed to give a statement.

A court reporter was called. He arrived at Area 5 at about 1:55 a.m. on September 25, 1993. Salgado gave a statement that was nine type-written pages. After the statement was completed, Salgado's picture was taken. Salgado was given an opportunity to see the typed statement and make any corrections or revisions. He signed the statement.

The only other witness to testify was Detective Ray Guevara. Previously, Guevara had worked as a detective in the gang crimes unit. He held that position for 15 years. Guevara was proffered and received as an expert on gangs.

Guevara explained that there are two major gang groups, the

"Folks" and the "People." These two groups are enemies or rivals of one another. Both groups have certain hand signals that are used to identify themselves to each other. In addition, he said, "throwing down" a sign is degrading or disrespectful to that gang and "looking for trouble."

Guevara testified that, in addition to hand signals, gangs identify themselves through the colors they wear, the way they wear their hats, tattoos, and earrings. Guevara explained that Pachukos usually have a cross with slashes tattooed between their thumb and forefinger. Members from all gangs, however, may tattoo an empty teardrop beneath their eye when one of their friends has been killed. Once the death of that friend is avenged, by the killing of a rival gang member, the tear drop will be filled in with red.

On the evening of September 24, 1993, Detective Ray Guevara met Salgado and noticed that he had a tear drop tattooed under his eye.

Guevara also testified that when a gang member shouts "Disciple Killer," that person is saying that he is someone who kills Disciples or other gangs who are affiliated with the Folk nation of gangs. The term would never be used by a member of the Disciples.

Finally, Guevara testified that most gang members use nicknames. Often the members don't even know each others' real names and only know each other by nicknames.

The only defense witness was Salgado. He testified that, on September 24, 1993, he was 17 years old. He admitted that he was a member of the Pachuko gang and had been since he was 13 years old. He also admitted that he had a tear drop tattooed under his eye to represent his friend who was shot by gangs.

Salgado did not deny involvement in the shooting that took place on September 24, 1993. He testified that he had been carrying a gun, which Rodriguez had given to him at Schurz High School. They were driving to get something to eat after school when they saw a beige car behind them. The passenger in the beige car threw down the "Crown" and threw up the "Pitchfork," symbolizing that he was a member of the Folks. Salgado and the other boys in the car were all members of the Pachukos, a faction of the People. They were enemies of the Folks. They decided to go after the beige car and beat up the two guys inside.

Salgado testified that when they caught up to the beige car, which had stopped at an intersection, Rodriguez got out first. Salgado followed, went up to the passenger in the beige car and tried to grab him. The passenger pulled away. Salgado testified that he "got scared" and started to go back to the red car. He walked to the back

of the beige car, stopped, and watched as his friends kicked in the windows on the beige car. He said that he saw the passenger "duck down" and thought he might be going for a gun. Salgado never saw a gun.

Nevertheless, Salgado pulled out the gun he had in his pocket and fired two shots into the car. He claimed that he only pulled the trigger once, although he admitted that the gun fired twice. He also claimed that he was shooting at the back seat "to scare them" and that he had not intended to harm or kill either of the two people in the car.

After shooting into the car, Salgado got back into Rodriguez's car along with the others. They left the area. Monkey did not get into the car, he ran off. They picked him up later. Salgado said he put the gun in the glove compartment of Rodriguez's car and never saw it again.

Later that evening, Salgado said, he was arrested while he was eating dinner at a restaurant. He admitted that he gave the court-reported statement to the police and assistant State's Attorney, but claimed that Detective Conwell told him that it would not be proper to include the part about him shooting because he felt threatened.

In rebuttal, the State produced Detective Conwell and ASA Hughes to refute Salgado's testimony that Conwell had not allowed him to give his reason for shooting at Manzella.

After hearing argument and being given instructions, the jury returned a verdict of guilty of first degree murder and attempted first degree murder. At sentencing, the court declined to sentence Salgado to an extended term but sentenced him to consecutive terms of 50 years for the murder conviction and 20 years for the attempted murder conviction.

## DECISION

The first issue raised on appeal is whether the trial court erred when it ruled that Salgado's post-arrest statements to the police and assistant State's Attorney were voluntarily given.

At a pretrial hearing, Salgado testified that he and a friend, Francisco Rivera, were arrested on the evening of September 24, 1993, at Huey's restaurant. Salgado said that when he was arrested the officers handcuffed him, placed him inside their unmarked police car, and then threatened him while asking him questions about the shooting. Salgado claimed that he was not advised of his constitutional rights prior to this questioning.

After about 10 minutes of questioning, Salgado said, Rivera was put inside the police car and they were transported together to Area

headquarters. Salgado was placed in a small room and handcuffed to the wall.

At the police station, Salgado said, he was questioned by detectives, who did not advise him of his rights. Salgado also claimed that he made statements to these detectives only because they threatened him and beat him while he was still chained to the wall. Salgado claimed that he never was advised of his constitutional rights until he gave a court-reported statement to the assistant State's Attorney.

To refute Salgado's testimony, the State presented the testimony of Detective Suria. He testified that when he and his partner, Detective Luva, arrested Salgado at Huey's restaurant, they immediately transported him to the police station. Rivera, he said, was not arrested.

Detective Suria testified that neither he nor his partner questioned Salgado before, during, or after transporting him to Area 5 headquarters. He denied striking Salgado, threatening to strike Salgado, or seeing anyone else strike or threaten him.

Detective Conwell also took the stand. He testified that he first interviewed Salgado at about 8:20 p.m. on September 24, 1993. Salgado was in one of the interview rooms, handcuffed to the wall. He stated that he advised Salgado of his rights by reading them from his Fraternal Order of Police book. Thereafter, in a 20-minute conversation, Salgado admitted his involvement in the shooting. Felony review was contacted and Salgado was not interviewed again until about 12:30 a.m., when ASA Hughes arrived and met with Salgado. ASA Hughes readvised Salgado of his rights and Salgado agreed to speak with him. Salgado also agreed to give a court-reported statement.

Conwell denied ever striking Salgado, threatening him, or seeing anyone else strike or threaten him. Conwell also specifically denied that he or anyone else placed a helmet on Salgado's head, placed telephone directories on his head, or struck him on the head. He said, "That didn't happen." Conwell also testified that Salgado had been cooperative and had never refused to talk with him.

ASA Hughes testified. He said that he advised Salgado of his rights when he first met with him at about 12:45 a.m. on September 25, 1993. Salgado spoke with him for about 30 minutes, then agreed to give a court-reported statement. Hughes testified that Salgado never complained that he was mistreated by the police. Salgado signed the court-reported statement, in which he had answered questions about the treatment he received, stating that he had been treated well by the police.

Salgado's counsel moved for a directed finding based on the State's failure to call all material witnesses. This motion was denied.

At a subsequent hearing date, Salgado produced Francisco Rivera, who testified that he had been arrested with Salgado on the evening of September 24, 1993, and that he witnessed the police physically assault Salgado while questioning him in the police station.

Rivera said that he was taken to the police station with Salgado and held there for about four hours. He sat on a bench that was situated across the room from the small interview room where Salgado was placed. The interview room had a window in the door that was about eight inches wide by three feet long. Through this window he could see Salgado.

He saw lots of officers come and go from Salgado's room. About two hours after they got to the police station, Rivera saw some officers go into Salgado's room and ask him questions. The officers, Rivera said, questioned Salgado for about two hours. He couldn't hear what was said, but he could see Salgado shaking his head "no." Then, Rivera testified, he saw a police officer place a thick yellow-pages telephone book on Salgado's head and hit it with his night stick. This went on for about five minutes, until one of the officers realized that Rivera could see into the room. Then Salgado was moved out of view. Soon thereafter, Rivera was allowed to leave the police station. He said the officers told him he had been held so that he couldn't "let the other guys know so they could leave out of town." On cross-examination Rivera admitted that he was a member of the Mighty Latin Pachukos.

Salgado was recalled to testify concerning the treatment he received while being interrogated. He testified that after he was taken into the interview room by the two officers who transported him, another officer (identified as Detective Conwell) came in, began calling him names and told him that he better tell them that he "did it" because he was going to talk one way or the other. Then the detective punched him in the stomach with his fist.

In addition, Salgado said, later that evening one of the arresting officers came back into the room, placed something black (like a helmet) on Salgado's head, then put two telephone directories on top of the helmet. The officer then struck the phone books with a large stick that looked like an officer's night stick.

Detective Conwell then came into the room. Salgado asked to go to the washroom. Conwell took him to the washroom and gave him some cigarettes. Conwell asked him if he would talk. Conwell, he said, told him they would beat him again if he didn't agree to talk. Salgado said that he agreed to make a statement because he didn't want to be beaten anymore.

After he agreed to give a statement, he was left alone in the

room for a long while, until the court reporter came. On cross-examination, Salgado admitted that he had been arrested before.

After Salgado testified, defense counsel complained to the trial judge that he had not been informed by the State which officers were present at defendant's questioning at the police station. The trial court continued the hearing so that defense counsel could obtain this information and present other witnesses.

At the next hearing some months later, no additional evidence was offered. The trial court ruled against defendant's motion to suppress his post-arrest statements, finding the testimony of Rivera and Salgado not credible.

■ Once a defendant asserts that a confession is coerced, the defendant's confession will be admitted at trial only if the State can prove, by a preponderance of the evidence, that the confession was voluntary and defendant intentionally relinquished his right against self-incrimination. *Lego v. Twomey*, 404 U.S. 477, 30 L. Ed. 2d 618, 92 S. Ct. 619 (1972); *People v. Barragan*, 266 Ill. App. 3d 961, 641 N.E.2d 535 (1993). When deciding the voluntariness of a statement, the court must consider the totality of the circumstances, which may include the defendant's age, intelligence, experience, physical condition, the length of the interrogation, and whether the defendant was exposed to threats, promises, or physical coercion. *People v. Brown*, 169 Ill. 2d 132, 144, 661 N.E.2d 287 (1996); *People v. Randle*, 277 Ill. App. 3d 788, 801, 661 N.E.2d 370 (1995). The determination of whether a confession is voluntary is a matter for the trial court, and its decision will not be disturbed unless it is against the manifest weight of the evidence. *People v. Brown*, 169 Ill. 2d at 144; *People v. Ramey*, 152 Ill. 2d 41, 57, 604 N.E.2d 275 (1992).

On appeal, Salgado suggests two reasons why this court should reverse the trial court's ruling on the motion: (1) because, when ruling on the voluntariness of the statements, the trial court made certain comments about the testimony of Rivera and Salgado that were incorrect or inconsistent with their actual testimony, and (2) because the State failed to produce all material witnesses at the hearing on the motion to suppress. Neither argument is persuasive.

■ It is true that the trial court, when ruling on the motion, made some minor errors in its recollection of the evidence. However, those minor misconceptions are not controlling. The major issue to be resolved was the conflicting evidence about whether Salgado had been subjected to threats and physical coercion by the police. In the lengthy evidentiary hearings conducted, Salgado testified that he had been punched in the stomach by Conwell and hit over the head by another unidentified officer. To a large extent, Rivera corroborated Salgado's testimony about being hit over the head.

Detective Suria, Detective Conwell, and ASA Hughes, however, contradicted that testimony. First of all, the officers disputed Rivera's claim that he had been arrested on September 24, 1993. According to the officers, Rivera was not even present in the police station when Salgado was questioned.

Furthermore, Detectives Suria and Conwell both denied that they, or any other officer, threatened, struck, or threatened to strike Salgado. ASA Hughes testified that he spoke with Salgado privately and he never complained of ill treatment. In his court-reported statement, which he signed, Salgado said that he had been treated well. In a photograph taken immediately after the court-reported statement, Salgado appeared in good health. He was smiling. The paramedic's report on Salgado indicated that he was in good health and had no signs of injury. Salgado never complained to anyone that he was physically mistreated by the police.

The trial court, which had the opportunity to observe the witnesses, resolved the conflicting evidence by concluding that Salgado and Rivera were not credible. This conclusion is not against the manifest weight of the evidence.

■ Next, defendant makes the bald assertion, without any substantiation, that Detective Moreth was a material witness on the issue of the voluntariness of defendant's statements. Defendant claims, therefore, that the trial court should have suppressed his post-arrest and court-reported statements simply because the State failed to call this witness. Though he acknowledges the demise of "the material witness rule," a rule which was born out of *dicta* in the case of *People v. Rogers*, 303 Ill. 578, 136 N.E. 470 (1922) (see *People v. R.D.*, 155 Ill. 2d 122, 613 N.E.2d 706 (1993)), he claims that *People v. Patterson*, 154 Ill. 2d 414, 610 N.E.2d 16 (1992), requires a trial court to make a specific finding that the testimony of the absent material witness is not necessary to the question of voluntariness.

We find no support for defendant's claim. In *People v. R.D.*, the court held:

> "Accordingly, statutes and court rules which provide for liberal discovery by the defense have eliminated the need for a separate material witness rule.
>
> Current statutes and court rules have likewise eliminated the need for a separate rule requiring the State *to call* all material witnesses at a suppression hearing. ***
>
> We also note that, at the time the material witness rule was adopted, defendants did not enjoy the constitutional and statutory protections now available to safeguard the privilege against self-incrimination and to prevent the admission of coerced confessions into evidence." (Emphasis in original.) *R.D.*, 155 Ill. 2d at 141-42.

The *R.D.* court concluded that a "defendant may not claim, however, that the trial court's ruling on a motion to suppress must be reversed simply because the State failed to call a material witness to testify at the suppression hearing." 155 Ill. 2d at 145.

In the present case defense counsel, at the suppression hearing, moved for a directed finding on his motion to suppress due to the State's failure to produce and call all material witnesses. The trial court continued the evidentiary hearing to provide defense counsel with additional time to obtain discovery from the State and to call any witness necessary to the issue of voluntariness. At the next hearing, which was held a few months later, defense counsel called no additional witnesses. We assume, therefore, that the testimony of Detective Moreth, who defendant now claims was a material witness, was consistent with the other officers' testimony. In any event, without any showing of prejudice, the mere fact that the State failed to call every police officer involved in the investigation of Manzella's murder is no basis for finding that the trial court abused its discretion in finding defendant's confessions voluntary.

■ Defendant next contends that the trial court erred when it denied his pretrial motion to preclude the prosecution from referring to him at trial by his nickname, "Bam Bam." Defendant's brief, however, contains minimal argument on this point and cites no authority for his assertion that the use of his nickname was unnecessary, irrelevant to any issues at trial, and that he was prejudiced by the admission of this evidence. We may consider this issue waived for review. See *People v. Salazar*, 211 Ill. App. 3d 899, 570 N.E.2d 802 (1991) (point not adequately presented to the appellate court for review where defendant failed to cite authority or refer to record).

Even if we were to review this claim, however, we would find no error. General principles of fair play dictate that a nickname that has a pejorative connotation be used sparingly. *People v. Murillo*, 225 Ill. App. 3d 286, 587 N.E.2d 1199 (1992). But even when this is the case, it is not improper to allow a defendant to be referred to by his nickname if witnesses knew and identified defendant by that name. *Murillo*, 225 Ill. App. 3d at 294. Here the evidence was relevant. A trial court's decision on the admission of evidence will not be disturbed unless an abuse of discretion resulting in prejudice to the defendant is clear from the record. *People v. Houston*, 185 Ill. App. 3d 828, 541 N.E.2d 1191 (1989).

In this case, defendant's nickname "Bam Bam" does not carry a negative connotation that is immediately recognizable. Defendant, in fact, explained at trial that he got his nickname when he was a child because he was "chubby." Furthermore, the State's witnesses who were defendant's friends knew and identified him by that nickname.

Defendant does not argue that the prosecutor's actual use of the nickname was excessive, nor does he attempt to show how the use of his nickname at trial prejudiced his position. Under these circumstances, we cannot say that the trial court abused its discretion by allowing defendant's nickname to be admitted into evidence at trial.

■ Next, defendant argues that the jury should have been instructed on second degree murder. Salgado requested such an instruction and the trial court refused, finding that there was no evidence to justify the giving of the instruction. The court did, however, instruct the jury on involuntary manslaughter based on reckless conduct.

On appeal, defendant contends that the evidence he presented was sufficient to have raised the issue of whether he had a subjective belief, though unreasonable, that self-defense was necessary. He points to his trial testimony in which he claimed that he became afraid for his safety and the safety of his friends when he saw Balthazar bend down towards the floor of the beige car he was sitting in.

"The function of jury instructions is to convey correct principles of law applicable to the evidence adduced at trial." *People v. Shaw*, 278 Ill. App. 3d 939, 951, 664 N.E.2d 97 (1996). A defendant's actions will constitute second degree murder if the killing was motivated by either (a) a sudden and intense passion resulting from serious provocation, or (b) an actual but unreasonable belief that the circumstances required the use of deadly force as a means of self-defense. 720 ILCS 5/9—2 (West 1992); *People v. Rivera*, 255 Ill. App. 3d 1015, 627 N.E.2d 294 (1993). Instruction on the alternative form of second degree murder, *i.e.*, unreasonable belief in justification, is not warranted, however, where defendant is the aggressor and the defendant's use of force is exerted while defendant is attempting to commit, committing, or escaping after committing a forcible felony. *People v. Tenner*, 157 Ill. 2d 341, 626 N.E.2d 138 (1993).

All of the evidence in this case showed that defendant and his three companions were the aggressors, attacking Manzella and Balthazar, who were sitting in a car, unable to move because they were stuck in traffic. In addition, defendant and his friends went in pursuit of the beige car, determined to "beat up" the two occupants. They outnumbered the occupants of the car, were armed with a gun and a baseball bat, and they physically assaulted both the occupants and their vehicle. The victims never made any move to retaliate and no one, including defendant, saw them with any weapons. At the time of the shooting, defendant was standing at the rear of the car, the victims facing forward. Manzella was shot in the back. There was no evidence that defendant was in any imminent danger. This was a cold and senseless killing.

Under the circumstances, we cannot say that the trial court erred when it refused to instruct the jury on second degree murder. See *People v. Gutirrez*, 205 Ill. App. 3d 231, 564 N.E.2d 850 (1990) (where defendant was in a position of safety, he did not communicate with the victim, and the victim did not approach defendant, and the victim did not have a weapon, it was not error for the court to refuse to instruct on second degree murder).

■ The next two issues—four and five—are waived. The fourth issue is whether the trial court's instruction on attempted first degree murder was erroneous because it did not include the language "without justifiable use of force." The fifth issue is whether the trial court erred when it provided the jury, at its request, with a transcript of Detective Guevara's testimony. Detective Guevara testified as an expert on gang crimes and provided information about gang signs, colors and other gang-related behavior.

In both of these issues, however, the argument presented to this court is inadequate. On issue four, defendant's brief contains two paragraphs—a total of 13 lines. On issue five, the argument consists of two paragraphs totaling 14 lines. Not a single case or authority is presented to support the positions being urged in these issues. Under these conditions, the issues are waived for review. See *People v. Salazar*, 211 Ill. App. 3d 899, 911, 570 N.E.2d 802 (1991).

There are additional reasons for finding issue four has been waived. Defendant did not object at trial to the instruction given, he did not tender the instruction now being proposed, nor did he include this issue in his post-trial motion. Each of these reasons would, individually, support a finding that the issue is waived. *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988); *People v. Smith*, 71 Ill. 2d 95, 374 N.E.2d 472 (1978).

As to issue five, the decision to grant a jury's request for transcripts is left to the discretion of the trial court and will not be disturbed unless an abuse of that discretion is shown. *People v. Steidl*, 142 Ill. 2d 204, 568 N.E.2d 837 (1991). Defendant has not presented any evidence from which this court could find that the trial court's decision was an abuse of discretion.

■ The final issue before this court is the length of the sentence imposed. Salgado suggests that his sentence was excessive because the circuit court abused its discretion by imposing a sentence reflective solely of retribution and the need for deterrence. Salgado also contends that the circuit court gave improper weight to some aggravating considerations and insufficient regard to mitigating circumstances, such as defendant's age, rehabilitation potential, the absence of prior convictions, and the strong family support.

The State contends that defendant has waived review of his sentence by his failure to file a post-sentencing motion as required by section 5—8—1(c) of the Unified Code of Corrections. See 730 ILCS 5/5—8—1(c) (West 1994).

Effective August 11, 1993, section 5—8—1(c) was amended to read as follows:

"(c) A motion to reduce a sentence may be made, or the court may reduce a sentence without motion, within 30 days after the sentence is imposed. *A defendant's challenge to the correctness of a sentence or to any aspect of the sentencing hearing shall be made by a written motion filed within 30 days following the imposition of sentence.*" (Emphasis added.) 730 ILCS 5/5—8—1(c) (West 1994).

A number of courts have interpreted this amendment as creating a precondition for an appeal of sentencing issues. See *People v. Moncrief*, 276 Ill. App. 3d 533, 659 N.E.2d 106 (1995); *People v. McCleary*, 278 Ill. App. 3d 498, 663 N.E.2d 22 (1996); *People v. O'Neal*, 281 Ill. App. 3d 602, 667 N.E.2d 516 (1996); *People v. Reed*, 282 Ill. App. 3d 278, 668 N.E.2d 51 (1996) (motion should be the functional equivalent of the post-trial motion necessary to preserve issues for appeal).

The sentencing in this case occurred after the effective date of the amendment. No motion challenging the sentences was filed by the defendant in the trial court. It was not until the attempted late filing of a reply brief that the defendant alleged consecutive sentences were improperly based on infliction of severe bodily harm, a double enhancement thus taking place. Until then, the defendant's only sentencing contention on appeal was that the trial judge incorrectly weighed aggravating and mitigating factors. We denied leave to file the out-of-time reply brief.

We believe the defendant's failure to file a motion in the trial court waived the sentencing issues he now raises. Further, the issue of double enhancement never was properly raised. That, too, is a waiver.

In addition, we note that the trial judge carefully weighed the relevant aggravating and mitigating factors. He understood the grave impact of a lengthy sentence on a 17-year-old. He also understood he was dealing with an unjustifiable and pointless killing on a public street and that the only reason for the shootings was that the victims may have formed their fingers in a certain way and pointed them in a certain direction. As the trial judge said: "it must be brought home to these gang members that when they're caught, the price they're going to pay is terrible."

We do not believe the trial judge abused his discretion when he sentenced the defendant.

CONCLUSION
We affirm the defendant's convictions and sentences.

Affirmed.

CERDA and BURKE, JJ., concur.