2022 IL App (2d) 210495-U
No. 2-21-0495
Order filed October 26, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-2252 |
| ANTON CROSS, | ) ) | Honorable David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court.
Presiding Justice Brennan and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held*:  (1) We have jurisdiction over this appeal because the trial court was revested with jurisdiction when the parties agreed to modify the restitution order, and defendant filed his appeal within 30 days of that modified order.  (2) We affirm defendant's second-degree murder conviction where the State proved beyond a reasonable doubt that the victim was not armed with a gun and, thus, defendant's subjective belief in the need for deadly force was unreasonable.  (3) We remand for entry of a restitution order with the statutorily required payment terms.

¶ 2   Following a bench trial in the circuit court of Kane County, defendant, Anton Cross, was found guilty of second-degree murder (720 ILCS 5/9-2(a)(2) (West 2016)) for the shooting death of Timothy Jones.  The court sentenced defendant to a nine-year prison term and ordered to pay

restitution. Defendant argues on appeal that the State failed to prove beyond a reasonable doubt that he did not act in self-defense. Defendant alternatively argues that the case must be remanded to the trial court to correct the restitution order. We affirm defendant's conviction and remand for entry of a proper restitution order.

¶ 3                                I. BACKGROUND

¶ 4      Evidence admitted at trial established that defendant and Timothy were formerly neighbors. Timothy lived in Elgin, two doors down from defendant on Washington Street, and later moved to a second-floor apartment on Maple Lane. Timothy, then age 18, was shot outside that apartment in the early afternoon of December 27, 2016. Timothy's father, Island Jones, testified that he was in the apartment with Timothy's 15-year-old cousin, Antwon Jones, when the shooting occurred. Timothy was on electronic home monitoring at the time. Timothy told Island that he was taking the garbage out. Island looked out the window and saw Timothy in the apartment building's parking area talking to defendant. Island recognized defendant as Timothy's former neighbor from Washington Street. Timothy did not have anything in his hands. Island also saw a red four-door Ford parked on the street outside the apartment.

¶ 5      After turning away from the window, Island heard a "pop." He opened the apartment door and saw Timothy coming up the stairs. Timothy, who still had nothing in his hands, said that "Tune" had shot him. Timothy lay down on the floor, and Island took off Timothy's coat or jacket. Island testified that there was no weapon in the jacket, but he acknowledged that he did not check inside the pockets. However, Island felt outside the pockets when he took off the jacket. Island did not feel anything inside the pockets. After Island took off Timothy's coat, Timothy lifted his shirt, and Island saw a bullet wound to Timothy's stomach. Island called 911. The police arrived, as did paramedics, and Timothy was transported for medical treatment. He later died from the

gunshot wound. Detectives asked Island to travel with them to Washington Street, where he observed the same red four-door Ford he had seen outside the Maple Lane apartment before the shooting.

¶ 6 The parties stipulated that, if the State called Antwon as a witness, he would testify that he was in the Maple Lane apartment on December 27, 2016. Sometime after noon, he heard a single gunshot. He went to the balcony, where he saw two people speeding away in a red four-door Ford Taurus. He recognized the driver, whom he knew by the name "Tone." When Timothy entered the apartment, Antwon heard him tell Island that Tone had shot him.

¶ 7 Elgin police officer David Mendiola responded to the incident. He and another officer, Justin Gist, arrived before the paramedics. Mendiola patted down Timothy for weapons and found none. He then applied pressure to Timothy's wound. When the paramedics arrived, Mendiola spoke with Antwon. Mendiola and Gist conducted a cursory search of the apartment and found no weapons. However, they were not looking specifically for weapons. Mendiola then received an assignment to photograph the scene and collect evidence. Mendiola recovered a shell casing in the parking area. Mendiola and Gist then went to the hospital where Timothy had been taken and received a bag containing Timothy's clothing and personal belongings. There was no gun among those items.

¶ 8 The police began surveillance of the vehicle identified by Island on Washington Street. As the vehicle drove away, the police conducted a traffic stop. Elgin detectives Christopher Hughes and David Baumgartner brought Antwon to the traffic stop scene. Antwon identified one of the individuals in the vehicle as "Tone." Hughes and Baumgartner identified defendant in open court as the individual Antwon referred to as Tone.

¶ 9    The police searched defendant's residence on State Street and found a 9-millimeter handgun hidden behind a plumbing access panel. Forensic testing showed that the gun recovered from defendant's home fired the bullet recovered from Timothy's body and the shell casing found at the scene.

¶ 10    Defendant was born on February 4, 1999, and was 17 when Timothy was shot. He lived with his mother and younger siblings in a townhouse on Washington Street. Defendant regularly bought cannabis and Xanax from Timothy. When they were neighbors, defendant saw Timothy rob people at gunpoint using various guns. On the day of the shooting, defendant received a Snapchat call from Timothy, who had marijuana to sell. Defendant agreed to buy half an ounce. Driving his red Ford Taurus, defendant picked up a friend, Jaquez Stokes, and drove to Timothy's apartment on Maple Lane. Two minutes before arriving, he called Timothy to tell him he would be there soon. Defendant parked at the curb, expecting Timothy to approach the vehicle as he had done in the past. However, Timothy just stood in the driveway area. Defendant, who had a gun in his pocket, got out of the car and walked up to him. Defendant asked Timothy for the cannabis. Timothy told defendant to wait for two cars to go by. According to defendant, after the cars went by, "[Timothy's] demeanor changed and he told me to give him that shit." Out of his right pocket, Timothy pulled a handgun with a "[s]hiny," "[b]ig and silver" barrel. Defendant feared for his life. He took a step backward, reached for his gun, aimed down, and fired a shot. He then ran to his car and drove home.

¶ 11    Defendant testified that he had received a settlement from a medical malpractice lawsuit. He used a portion of the settlement to buy a Lexus for his mother. Timothy was aware of the settlement and had seen the Lexus when defendant bought drugs from him earlier that month.

¶ 12    Defendant presented evidence that Timothy had been involved in violent altercations with others.  Defendant also presented evidence that Timothy, his brother Jeremy, and a third individual (possibly acting under duress) robbed and kidnapped an individual in Glen Ellyn.  Timothy pointed a gun at the victim.  During the crime investigation, the police recovered a BB gun designed to look like a revolver with a silver barrel.  The BB gun matched the victim's description of the weapon Timothy pointed at him.

¶ 13    The trial court found that defendant believed that he was justified in using deadly force against Timothy, but the belief was unreasonable.  The trial court did not expressly discredit defendant's testimony that Timothy pulled a gun on him.  However, the court did question how defendant could have seen Timothy with a silver-barreled pistol, given that the police had seized such a weapon after the Glen Ellen kidnapping and robbery.

¶ 14    Following a hearing on July 8, 2021, the trial court sentenced defendant to a nine-year prison term and ordered him to pay $47,558.50 in restitution, including $34,098.06 payable to Blue Cross/Blue Shield for Timothy's medical bills.  On July 20, 2021, defendant filed a motion to amend the mittimus, seeking sentencing credit for time spent on electronic home monitoring.  On August 11, 2021, the court entered an agreed order to reduce the restitution payable to Blue Cross/Blue Shield to $2222.50.  On August 26, 2021, the trial court denied the motion to amend the mittimus.  Defendant filed his notice of appeal the same day.

¶ 15                                    II. ANALYSIS

¶ 16    Defendant argues that the evidence is insufficient to sustain his conviction of second-degree murder.  He alternatively argues that the restitution order is defective because it does not specify whether restitution will be paid as a lump sum or in installments over a fixed period.

Before addressing those issues, we must first consider the State's argument that we lack jurisdiction because defendant's notice of appeal was not timely.

¶ 17    Here, the time for filing a notice of appeal is governed by Illinois Supreme Court Rule 606(b) (eff. Mar. 12, 2021), which provides, in pertinent part:

"[T]he notice of appeal must be filed with the clerk of the circuit court within 30 days after the entry of the final judgment appealed from or if a motion directed against the judgment is timely filed, within 30 days after the entry of the order disposing of the motion."

It is well established that "the final judgment in a criminal case is the sentence." *People v. Caballero*, 102 Ill. 2d 23, 51 (1984). Here, the trial court-imposed sentence on July 8, 2021. On July 20, 2021, defendant filed a motion to amend the mittimus, seeking credit toward his sentence for time spent on electronic home monitoring. The trial court denied the motion on August 26, 2021, and defendant filed his notice of appeal the same day. Relying on *People v. Wright*, 337 Ill. App. 3d 759 (2003), the State argues that the motion to amend the mittimus did not extend the time for filing the notice of appeal.

¶ 18    In *Wright*, the defendant entered a negotiated plea of guilty to possession of a controlled substance with intent to deliver. On August 8, 2001, the court sentenced him to a five-year prison term. On October 9, 2001, the defendant filed a motion to correct the mittimus to reflect additional days' credit against his sentence for time already served. The court amended the mittimus that same day. The defendant subsequently moved to withdraw his guilty plea pursuant to Illinois Supreme Court Rule 604(d) (eff. July 1, 2017), which provides:

"No appeal from a judgment entered upon a plea of guilty shall be taken unless the defendant, within 30 days of the date on which sentence is imposed, files in the trial court

- 6 -

a motion to reconsider the sentence, if only the sentence is being challenged, or, if the plea is being challenged, a motion to withdraw the plea of guilty and vacate the judgment." We concluded that the motion was untimely because it was not filed within 30 days of August 8, 2001, when the court initially imposed the sentence.

¶ 19    We rejected the defendant's argument that the 30-day period for filing the Rule 604(d) motion started when the mittimus was corrected. We reasoned as follows:

> "For defendant's motion to have been timely filed under Rule 604(d), we would have to construe the court's issuance of an amended mittimus as the same as if it issued a new sentence. A trial court's act of correcting a mittimus, however, is a ministerial act and does not change the underlying sentence. [Citations.] The mittimus is a document directed to a sheriff, warden, the Department of Corrections, or other executive officer detailing a prisoner's sentence, which is often simply a copy of the judge's signed judgment or order. [Citation.] It is not a part of the common law record, and the trial court may amend the mittimus at any time. [Citation.] In other words, the mittimus informs the person or entity detaining a prisoner about the specifics of the prisoner's sentence so that the prisoner's release date can be readily determined." *Wright*, 337 Ill. App. 3d at 762.

¶ 20    As discussed above, the time allowed for filing the notice of appeal here is governed by Rule 606(b). Rule 606(b) provides that the notice of appeal is due "within 30 days after the entry of the final judgment appealed from or if a motion directed against the judgment is timely filed, within 30 days after the entry of the order disposing of the motion." Ill. S. Ct. R. 606(b) (eff. Mar. 12, 2021). Defendant maintains that, under this rule, his notice of appeal was due within 30 days after August 26, 2001, when the trial court denied the motion to amend the mittimus. Defendant's argument assumes that the motion to amend the mittimus was "a motion directed against the

judgment" within the meaning of Rule 606(b). As noted, the sentence is the final judgment in a criminal case. *Caballero*, 102 Ill. 2d at 51. Given that an amended mittimus does not give rise to a new sentence, a motion to amend the mittimus is not "directed against" the sentence. Further, because a motion to amend the mittimus is not directed against the sentence, it is not directed against the judgment. Thus, the motion to amend the mittimus did not extend the time for filing the notice of appeal.

¶ 21    Nonetheless, we agree with defendant that we have jurisdiction to hear this appeal. Defendant notes that his sentence originally included $47,558.50 in restitution, including $34,098.06 payable to Blue Cross/Blue Shield for Timothy's medical bills. On August 11, 2021, more than thirty days after sentencing, the parties agreed to reduce the amount payable to Blue Cross/Blue Shield to $2222.50, and the trial court entered a written order to that effect. Ordinarily, after 30 days, the trial court in a criminal case loses jurisdiction to modify its judgment. *People v. Johnson*, 2019 IL App (4th) 170622, ¶ 11. However, the trial court may reacquire jurisdiction under the revestment doctrine. "[T]he three requirements for revestment of the court's jurisdiction are: (1) active participation by the parties; (2) without objection; (3) in proceedings inconsistent with the merits of the earlier judgment." *People v. Bailey*, 2014 IL 115459, ¶ 16. These elements were met here when the parties agreed to modify the judgment by modifying the restitution award. After the court modified the judgment on August 11, 2021, defendant's notice of appeal filed 15 days later, on August 26, 2021, was timely.

¶ 22    Turning to the merits, we first consider the evidence's sufficiency to sustain defendant's conviction. On a challenge to evidence sufficiency, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in

original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and determining what inferences to draw. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000). On such matters, the reviewing court will not substitute its judgment for that of the trier of fact. *Id.*

¶ 23    At trial, defendant maintained that he was acting in self-defense when he shot Timothy. As our supreme court has explained:

> "Self-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense. [Citation.] The elements of self-defense are: (1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable. [Citations.] If the State negates any one of these elements, the defendant's claim of self-defense must fail. [Citation.]" *People v. Lee*, 213 Ill. 2d 218, 224-25 (2004).

A person is justified in using force that "is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2016).

¶ 24    Here, the trial court rejected defendant's claim of self-defense but found him guilty of only second-degree murder rather than first-degree murder as charged. A killing that would otherwise

be first-degree murder will be second-degree murder if, *inter alia*, the killing was motivated by an actual but unreasonable belief that the circumstances required the use of deadly force as a means of self-defense. *People v. Salgado*, 287 Ill. App. 3d 432, 446, (1997). Here, the trial court found that defendant actually believed that using deadly force was necessary. Whether defendant was guilty of second-degree murder depends on whether that belief was reasonable. Under the circumstances here, we believe that the reasonableness of that belief depends on whether, as defendant testified, Timothy pulled a gun on him. Even if defendant believed that Timothy planned to rob him, unless Timothy was armed there is no reason to believe defendant could not have thwarted the robbery merely by displaying his own weapon. Unless Timothy was armed, it was not reasonable for defendant to fire his weapon.

¶ 25    The State argues that "the evidence shows the victim was not armed, despite defendant's testimony to the contrary." Defendant stresses, however, that he was the only eyewitness to the actual shooting who testified at trial and that the trial court should not have ignored his testimony. We note that "when a defendant submits the only version of what occurred, the trier of fact may not disregard the account if the testimony is not improbable, uncorroborated, nor uncontradicted in its material parts." *People v. Walden*, 43 Ill. App. 3d 744, 749 (1976). Nonetheless, "the trier of fact need not accept as true a defendant's account of the incident but rather, in weighing such evidence, it must consider the probability or improbability of the testimony, the circumstances surrounding the killing, and the testimony of other witnesses." *Id.*

¶ 26    In our view, defendant's main hurdle to overcome for a claim of self-defense was that the gun Timothy supposedly pulled on him was never found. That is powerful circumstantial evidence that Timothy was unarmed when defendant shot him. If Timothy had a weapon, there would be only a limited number of reasonable explanations for what happened to it. Timothy could have

dropped his weapon after defendant shot him. However, Mendiola searched the area where the shooting took place. Since Mendiola could find the shell casing from defendant's gun, he almost certainly would have found any weapon that Timothy dropped after being shot.

¶ 27    Timothy also could have placed the gun in his coat pocket or other clothing. However, although the police did not search Timothy's coat, Island testified that when he removed the coat from Timothy, he did not feel anything inside the pockets. Also, the police patted Timothy down and did not find a weapon on him.

¶ 28    Defendant notes that the police did not specifically search Timothy's apartment for a gun, but Island testified that Timothy lay down on the floor after returning to the apartment. Thus, he would have had no opportunity to hide the weapon. Defendant also argues that, when Timothy returned to the apartment, he might have thrown the weapon down the stairs leading to the basement. Although that is possible, when evaluating the sufficiency of circumstantial evidence, the trier of fact " 'is not required to disregard inferences which flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt.' " *People v. Doolan*, 2016 IL App (1st) 141780, ¶ 40 (quoting *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 29    Moreover, defendant described seeing Timothy holding a gun with a long shiny silver barrel. However, while investigating a robbery and kidnapping in which Timothy was allegedly involved, the police confiscated a BB gun fitting that description. Although there was evidence that Timothy had ready access to guns and might conceivably have acquired one similar in appearance, it is also reasonable to infer that defendant (who had frequent dealings with Timothy) had seen Timothy with that weapon in the past. One could infer that he used that knowledge to

fabricate (or possibly imagine) a description of his encounter with Timothy on December 27, 2016. It would appear from the trial court's remarks that it drew such an inference.

¶ 30   Therefore, we conclude that the evidence presented at trial was sufficient to prove beyond a reasonable doubt that defendant did not act in self-defense.  Accordingly, we will not disturb his conviction of second-degree murder.

¶ 31   Finally, we consider whether the restitution order is deficient.  Section 5-5-6(f) of the Unified Code of Corrections (730 ILCS 5/5-5-6(f) (West 2016)) provides, "[t]aking into consideration the ability of the defendant to pay, *** the court shall determine whether restitution shall be paid in a single payment or in installments, and shall fix a period of time *** within which payment of restitution is to be paid in full."  The restitution order here does not meet this requirement, and defendant requests that we remand the case for entry of a restitution order in compliance with section 5-5-6(f).  The State confesses error and agrees with defendant (as do we) that we must remand the case for entry of a proper order.

¶ 32                                III. CONCLUSION

¶ 33   For the reasons stated, we affirm defendant's conviction of second-degree murder and remand the case to the circuit court of Kane County for entry of a proper restitution order.

¶ 34   Affirmed and remanded.